UNITED STATES of America, Plaintiff,

v.

Angel MARTINEZ, Victor Manuel Rivera, a/k/a "Ruben Rivera Mato," Nelson Vargas Paula, and Danny Martes, a/k/a "Manny," a/k/a "Jose Lopez Maldonado," Defendants.

No. 94 CR 120 (KMW).

United States District Court, S.D. New York.

Nov. 29, 1994.

Teresa A. Pesce, Asst. U.S. Atty. and Mary Jo White, U.S. Atty., New York City, for plaintiff.

David B. Levitt, Legal Aid Soc., New York City, for Martinez.

Nicholas Velez, Nicolas, Velez, Bufete, Juridico, P.C., Bronx, NY, for Rivera.

Telesforo Del Valle, Jr., New York City, for Paula.

Joel Cohen, New York City, for Martes.

MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Defendants are charged with distributing and conspiring to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841 and 846. They move to suppress

evidence obtained pursuant to search warrants issued in Puerto Rico, or, alternatively, for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine the validity of the Puerto Rican warrants.[1] For the reasons stated below, defendants' motions are denied.

## Background

Defendants were arrested in New York on February 5, 1994, when they allegedly accepted the delivery of packages containing cocaine that had been shipped from Puerto Rico. The government gives the following account of the events leading up to defendants' arrest, which is not contested by defendants. On February 3, 1994, Postal Inspectors in San Juan, Puerto Rico received a tip from a confidential informant that a shipment of narcotics would be sent via Express Mail to New York. O'Neill Aff. ¶ 2. At or about 7:00 p.m. on February 3, Postal Inspector Ivette O'Neill inspected packages at the Air Mail Facility at the San Juan Airport. *Id.* She noticed two packages of the same shape and size, with the same wrapping. *Id.* One package ("Package 1") was addressed to Ruben Rivera Mato at 2899 Kingsbridge Terrace, Apartment 44A, Bronx, New York ("Premises 1"); the second package ("Package 2") was addressed to "Jose Lopez Maldonado" at 2120 Tiebout Avenue, Apartment C22, Bronx, New York ("Premises 2"). *See* O'Neill Aff. Ex. 1. According to O'Neill, both packages met certain criteria of the Postal Inspectors' "drug-smuggling profile," in that they were heavy, well-wrapped, came from "a known drug source state," bore handwritten labels, and were being sent to a "high crime area," i.e., the Bronx.[2] *Id.* at ¶ 4. O'Neill states that, in addition, she noticed that the handwriting on the two airbills was the same, although the two packages had different return addresses and were mailed from two different post offices. *Id.* at ¶ 3. O'Neill took custody of the packages for the purposes of submitting them to a canine sniff by a dog trained in drug detection.

According to O'Neill, postal inspectors in the San Juan airport normally conduct canine sniffs with trained dogs handled by United States Customs Agents. O'Neill states that she attempted to reach the Customs Agents on the evening of February 3, after seizing the packages, but was unable to do so. On the morning of February 4, 1994, she took the two packages to the Customs Agents' section of the San Juan Airport. There, some time before 11:00 a.m., the packages were subjected to a canine sniff by a dog known as "Alex," who reacted positively for the presence of narcotics.[3] *Id.* at ¶ 5.

---

1. Defendants Victor Manuel Rivera ("Rivera") and Nelson Vargas Paula ("Paula") move to suppress the fruits of the search pursuant to the Puerto Rican warrant, and for a *Franks* hearing; Paula and defendant Angel Martinez ("Martinez") move to join all motions brought by their codefendants, to the extent that those motions are relevant to Martinez and Paula, respectively. I analyze both motions as if they had been brought by all the defendants.

   In addition to the motions considered here, defendant Danny Martes ("Martes") moved to suppress evidence obtained pursuant to the anticipatory warrant issued in New York, for an evidentiary hearing, the purpose of which was unspecified in his motion papers, and to strike the use of the alias "Jose Luis Maldonado" in the indictment. At a hearing before the court on July 14, 1994, I held that the anticipatory warrant met the requirements set forth by the Second Circuit Court of Appeals in *United States v. Garcia*, 882 F.2d 699 (2d Cir.1989), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). I therefore denied the motion to suppress. The motion to strike the alias "Jose Luis Maldonado" was unopposed by the government, and was granted.

2. The drug smuggling profile is apparently not codified, but is "adhered to as a general practice" by Postal Inspectors. Govt.Supp.Mem. at 4. In *U.S. v. Hill*, 701 F.Supp. 1522, 1526 (D.Kan.1988), *aff'd in part sub nom., U.S. v. Lux*, 905 F.2d 1379 (10th Cir.1990), the court described the profile as including the following elements: (1) package heavily wrapped in tape and attempt made to seal all openings; (2) hand printed or written labels; (3) unusual return name and address; (4) unusual odor coming from the package; (5) fictitious return address. Inspectors also consider whether the package originates from, or is being sent to, a "source city or a destination city" for illegal drugs. *Id.* at 1526–27 and n. 2. *See also U.S. v. Daniel*, 982 F.2d 146, 150 (5th Cir.1993).

3. According to the government, "Alex" was certified on January 14, 1993, and his track record is excellent. O'Neill Aff. at para. 5 n. 2. O'Neill states that on the seven occasions on which she has worked with "Alex," each time he has reacted positively to a package, it has contained narcotics. *Id.*

O'Neill states that on the same day, she verified that the return address on Package 1 was fictitious, and that the sender of Package 2 did not receive mail at the return address listed on the package. *Id.* at ¶ 6.

O'Neill then prepared an affidavit in support of an application for warrants to search the packages. The affidavit stated (1) that the packages had been found to exhibit several factors meeting the Postal Inspectors' "drug-smuggling profile" during a "routine inspection" at the San Juan Airport Air Mail facility; (2) that the packages had been submitted to "Alex," who had reacted positively for narcotics as to both packages; (3) that the return address on Package 1 was fictitious, and that although the return address on Package 2 was an existing Post Office Box number, the sender of Package 2 was not an authorized customer for that box number; and (4) that the labels on the two packages had similar handwriting, and were mailed at two different post offices on the same day. The affidavit made no reference to a tip from a confidential informant. On the basis of O'Neill's affidavit, warrants to search the packages were issued by United States Magistrate Judge Jesus Castellano of the District of Puerto Rico at 4:15 p.m. Rivera Notice of Motion Ex. C; O'Neill Aff. ¶ 7. The packages were opened at about 5:00 p.m., and were found to contain approximately five kilograms of a mixture containing cocaine. O'Neill Aff. ¶ 7.

The Postal Inspectors and the New York Drug Enforcement Task Force ("DETF") agreed that a postal inspector posing as a mail carrier would deliver the packages to their destinations. Once the packages were accepted at these destinations, the premises would be searched and the persons receiving the packages would be arrested. DETF therefore applied for anticipatory warrants to search the premises, contingent on acceptance of the packages by individuals identifying themselves as the addressees or as acting on their behalf. In an affidavit in support of the application for the anticipatory warrants, DETF agent Dave Joseph ("Joseph") stated, among other things, that the packages had been positively identified for cocaine by a drug-sniffing dog, and that they contained five kilograms of cocaine. Unlike O'Neill's affidavit, Joseph's affidavit stated that Postal Inspectors in San Juan had received a tip from a confidential informant. Joseph Aff. ¶ 5(b), Rivera's Notice of Motion Ex. E. Anticipatory warrants were issued on February 4, 1994, by United States Magistrate Judge Nina Gershon of the Southern District of New York.

On or about February 5, 1994, a postal inspector posing as a mail carrier brought Package 1 to its delivery address, Premises 1. According to the government, the inspector met defendant Martinez in the hallway of Premises 1. Martinez stated that the package was for someone who was staying with him, and directed the inspector to Martinez's apartment. Defendant Rivera came to the door of the apartment and signed for the package, using the name "Ruben Mato." Shortly thereafter, DETF agents searched the apartment, found the contents of the package, and arrested Martinez and Rivera. Amended Complaint, Rivera's Notice of Motion Ex. I.

Also on or about February 5, 1994, a postal inspector posing as a mail carrier brought Package 2 to its delivery address, Premises 2. According to the government, when the postal inspector arrived, he saw defendants Martes and Paula in the vestibule of the building. They stated that the package was for them. Martes asked to accept delivery in the hallway, and the inspector stated that he was required to deliver it to the Premises 2. When the inspector rang Premises 2, the inhabitants stated that they did not know anyone by the name of the addressee of Package 2. The inspector then returned to Martes and Paula. The government states that Martes led the inspector to Premises 2 and accepted delivery of Package 2 outside the door. Martes then went inside Premises 2 with the package. Shortly thereafter, DETF agents arrested Paula and searched Premises 2. They found Package 2 inside. A back window in the apartment was open, and Martes was not in the apartment. Martes ultimately surrendered approximately a month later. Defendants then filed the instant motion to suppress.

### Analysis

Defendants offer two arguments in support of their suppression motion. First, defendants argue that the seizure and detention of the packages by O'Neill constituted an "unreasonable seizure" in violation of defendants' Fourth Amendment rights.[4] Second, defendants contend that O'Neill's omission of the informant's tip from her affidavit in support of the Puerto Rican warrants renders those warrants invalid, or, alternatively, entitles defendants to a hearing on the validity of the warrants pursuant to *Franks v. Delaware.*

### I. Detention of the Packages

In *United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), the United States Supreme Court held that the temporary detention of packages for purposes of investigation is not an "unreasonable seizure" in violation of the Fourth Amendment, provided (1) law enforcement authorities have a reasonable suspicion of criminal activity; and (2) the packages are not detained for an unreasonable length of time. *See also United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2641–42, 77 L.Ed.2d 110 (1983) (applying doctrine of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to detention of personal property, and holding that detention of luggage on less than probable cause, in order to pursue a limited course of investigation, does not violate defendant's Fourth Amendment rights where there is "reasonable articulable suspicion" that luggage contains contraband or evidence of a crime). I conclude that both criteria are met in the case at bar, and thus that the detention of the packages did not violate defendants' Fourth Amendment rights.

#### A. *Reasonable suspicion*

■ Here, it is uncontested that the packages were seized on the basis of the following facts: (1) a tip from a confidential informant on February 3, stating that a shipment of narcotics would be sent via Express Mail from Puerto Rico to New York; (2) the presence of two Express Mail packages addressed to New York at the San Juan Express Mail Facility; (3) the observation that the airbills for these two packages were in the same handwriting, although the packages were mailed from different post offices and bore different return addresses; and (4) the conformity of both packages to several of the elements of the Postal Inspectors' "drug smuggling profile." Although this combination of factors does not, on its own, provide probable cause to *search* the packages, I find that it does provide a basis for the lesser degree of suspicion required to *detain* the packages for further inspection.

The government concedes that the confidential informant lacked a proven "track record" at the time of the tip. Martinez Supp. Mem. at 4; O'Neill Aff. ¶ 2 n. 1. Under the decisional law of the Second Circuit, however, "it is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy." *United States v. Wagner,* 989 F.2d 69, 73 (2d Cir. 1993) (citing *Illinois v. Gates,* 462 U.S. 213, 237–38, 103 S.Ct. 2317, 2331–32, 76 L.Ed.2d 527 (1983)). The government states, and defendants do not contest, that the informant has "intimate ties" with drug traffickers, and therefore has a basis for personal knowledge of the information contained in the tip. O'Neill Aff. ¶ 2 n. 1. Moreover, the tip was corroborated in part by O'Neill, who went to the San Juan Airport's Air Mail Facility and duly observed two packages that were destined for New York, that conformed in several respects to the Postal Inspectors' drug smuggling profile, and that were addressed in the same handwriting, although they were purportedly from different senders. As the Court of Appeals for the Second Circuit noted in *Wagner,* for purposes of establishing probable cause, "if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration." *Wagner,* 989 F.2d at 73. Less corroboration is needed here,

---

4. In its response to defendants' motion, the government argued that defendants lack standing to challenge the detention of the packages under the Fourth Amendment. Because I find that the detention of the packages was not unreasonable under the circumstances, I do not address the question of standing.

where the standard is the less rigorous one of reasonable suspicion. Indeed, some courts considering what is required to establish "reasonable suspicion" to detain a package have held that conformity to a drug smuggling profile alone is sufficient. *See United States v. Daniel,* 982 F.2d 146, 149 (5th Cir. 1993) (although any one of drug package profile characteristics standing alone might not provide reasonable suspicion of illegal activity, aggregate of factors passes muster under *Terry* doctrine); *United States v. Lux,* 905 F.2d 1379, 1382 (10th Cir.1990) (reasonable suspicion existed where package met three factors of Postal Service's drug package profile); *cf. United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991) (in case of suspected narcotics trafficking, suspicion is reasonable if, considering the totality of the circumstances, "the conduct would appear suspect to one familiar with the practice of narcotics couriers, albeit the pattern of behavior is innocuous to the trained observer"), *cert. denied,* 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *United States v. Hooper,* 935 F.2d 484, 494 (2d Cir.1991) (seizure of suitcase reasonable in light of behavior of suitcase's owner, which, among other things, was consistent with "drug courier profile that agents were familiar with as a result of their training"), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). I conclude that O'Neill had reasonable suspicion to seize and detain the packages in order to investigate whether probable cause existed to search them.

### B. *Reasonable Time of Detention*

■ Even where law enforcement officials have reasonable suspicion to detain a package, the United States Supreme Court has held that, "[t]heoretically ... detention of mail could at some point become an unreasonable seizure of 'papers' or 'effects' within the meaning of the Fourth Amendment." *Van Leeuwen,* 397 U.S. at 252, 90 S.Ct. at 1032. In *Van Leeuwen,* circumstances surrounding the mailing of two packages aroused the suspicion of a postal clerk in Mount Vernon, Washington, a town sixty miles from the Canadian border. He informed a police officer, who discovered additional reasons for suspicion. The packages

were detained while U.S. Customs Officers in Seattle investigated further. Approximately an hour and a half after the packages were initially seized, Seattle Customs discovered that the addressee of one of the packages was suspected of trafficking in illegal coins. This information was sufficient to provide probable cause to believe that the first package contained contraband or evidence of a crime. Because of the time difference, however, Seattle Customs could not obtain information the same day about the second addressee, who was located in Tennessee. The next morning, it was determined that the second addressee was also under investigation for trafficking in illegal coins. Seattle Customs then applied for search warrants to open the two packages. Between the initial seizure of the packages and the time the search warrants were executed in Mount Vernon, twenty nine hours had elapsed. The *Van Leeuwen* Court declined to draw a bright-line rule that a 29-hour detention does not violate a defendant's Fourth Amendment rights. 397 U.S. at 253, 90 S.Ct. at 1032–33. Nevertheless, the Court concluded that,

> on the facts of this case—the nature of the mailings, their suspicious character, the fact that there were two packages going to separate destinations, the unavoidable delay in contacting the more distant of the two destinations, the distance between Mt. Vernon and Seattle—a 29-hour delay between the mailings and the service of the warrants cannot be said to be "unreasonable" within the meaning of the Fourth Amendment. Detention for this limited time was, indeed, the prudent act rather than letting the packages enter the mails and then, in case the initial suspicions were confirmed, trying to locate them en route and enlisting the help of distant federal officials in serving a warrant.

*Id.* Courts applying *Van Leeuwen* to determine the constitutionality of the detention of mail have asked whether the detention was reasonable under the circumstances. *See United States v. Aldaz,* 921 F.2d 227, 230 (9th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. LaFrance,* 879 F.2d 1, 4 (1st

Cir.1989); *United States v. Mayomi*, 873 F.2d 1049, 1054 (7th Cir.1989).

Here, as in *Van Leeuwen*, the length of detention of the packages was due to an inability to reach cooperating law enforcement officials during nonbusiness hours, which temporarily delayed the further investigation needed to develop probable cause. O'Neill seized the packages at 7:00 p.m. on February 3. It is uncontested that she attempted to reach the Customs Service to arrange for a canine sniff the same evening, but was unable to do so. Instead, O'Neill brought the packages to the Customs Service the next morning, and the canine sniff was completed by 11:00 a.m. on February 4. Thus, at most sixteen hours elapsed between the seizure of the packages and the commencement of the sniff, of which the majority were nonbusiness hours. Once the sniff had been completed and the dog had alerted the Customs Service officials to the likely content of the packages, probable cause existed to search the packages. *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir.1992) (once narcotics dog "hit on" suspect's suitcases, police had probable cause to obtain a warrant). Warrants were issued at 4:15 p.m., and the packages were opened at 5:00 p.m., 22 hours after the initial seizure and less than the 29 hours found permissible in *Van Leeuwen*. I conclude that the length of detention was not unreasonable under the circumstances. *See Aldaz*, 921 F.2d at 231 (detentions of 72 hours and 51½ hours not unreasonable, where packages had to be flown 700 miles to nearest trained dogs, and canine sniff could not be conducted until next day because packages arrived in the evening); *Lux*, 905 F.2d at 1382 (detention of Express Mail packages for a day and half, including a Sunday, was not unreasonable); *Mayomi*, 873 F.2d at 1054 (detention of envelopes for two days pending a canine drug sniff not unreasonable, where envelopes arrived on a Saturday and were subjected to sniff the next Monday). Here, as in *Van Leeuwen*, retaining the packages rather than returning them to the stream of express mail was the more "prudent" option. 397 U.S. at 253, 90 S.Ct. at 1032–33. In fact, the reason for retaining the packages was even stronger here than in *Van Leeuwen*, because in *Van Leeuwen*, the investigation conducted to develop probable cause did not require the presence of the packages. Here, the presence of the packages was necessary for the canine sniff, and returning them to the mail stream would almost certainly require law enforcement officials to forgo the opportunity to establish probable cause. *Van Leeuwen* does not require this result.[5]

Finally, defendants argue that O'Neill could have acted more expeditiously than she did to establish probable cause, and that the existence of alternatives renders the detention here an unreasonable one. For example, defendants suggest that O'Neill could have approached the San Juan police department and requested that they conduct the canine sniff, rather than waiting for the Customs Service to resume business the next morning. Defendants' argument is unpersuasive. It is well established that law enforcement officers are not required to select the least intrusive means to conduct their investigations, provided the means chosen are reasonable under the circumstances. *See LaFrance*, 879 F.2d at 5 (reversing district

---

5. Defendants argue that, where packages are sent via Express Mail, a stricter standard of reasonableness is appropriate than the standard applied to the detention of first class mail, and that the detention here is unreasonable under this stricter standard. I disagree. Courts considering the constitutionality of the detention of packages sent via private courier or priority mail have generally not applied a heightened standard of reasonableness. *See, e.g., Lux*, 905 F.2d at 1382, *United States v. Hillison*, 733 F.2d 692, 696 (9th Cir.1984); *but see LaFrance*, 879 F.2d at 9 (stating noon delivery schedule of Federal Express requires court to apply a "somewhat stricter time constraint" than in *Van Leeuwen*, but finding length of detention reasonable). Even if a stricter standard were appropriate, the Court of Appeals for the First Circuit has noted that a defendant's interest in the timely receipt of mail is a contractual, rather than a constitutional one, and rarely outweighs the government's interest in law enforcement. *Id.* (contract-based interest in timely delivery "has not yet proved to be a decisive counterweight to the public's interest"). I note that here, by the time defendants could have expected delivery, the canine sniff had been conducted and the government had probable cause to search the packages. I conclude that the government's interest in law enforcement outweighs any interference with defendants' contractual interest in the timely receipt of their mail under the facts of this case.

court's finding that detention of Federal Express package was unreasonable, on the ground that district court failed to ask whether police procedures were reasonable, and district court instead suggested alternative procedures that might have lessened impact of detention). *See also United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (in stop ancillary to luggage detention, reasonableness of officer's decision to stop suspect "does not turn on the availability of less intrusive techniques"); *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985) (holding that "the question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it"). Because the detention here was reasonable, the existence of hypothetical, less intrusive alternatives does not render it a violation of defendants' Fourth Amendment rights.

## II. Validity of the Puerto Rican Warrants

█ Defendants next argue that because O'Neill failed to include the tip from the confidential informant in her affidavit in support of the warrants to search the packages, those warrants are invalid under the doctrine of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* the United States Supreme Court held that,

[w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as

if probable cause was lacking on the face of the affidavit.

438 U.S. at 156, 98 S.Ct. at 2676. Intentional or reckless omissions of material information, as well as false statements, may serve as the basis for a *Franks* challenge. *Rivera v. United States,* 928 F.2d 592, 604 (2d Cir. 1991) (citing *United States v. Campino,* 890 F.2d 588, 592 (2d Cir.1989), *cert. denied,* 498 U.S. 866, 111 S.Ct. 179, 112 L.Ed.2d 143 (1990)). Recklessness may be inferred where omitted information was "clearly critical" to the determination of probable cause. *Id.* Defendants contend that, by failing to include the tip in her affidavit, O'Neill omitted information that was critical to the determination of probable cause, and therefore that the warrants issued on the basis of her affidavit must be voided and their fruits suppressed. At minimum, defendants claim, *Franks* entitles them to a hearing on the validity of the warrants.

Defendants' argument must be rejected because defendants have not shown that the omission was "necessary to the finding of probable cause." *Id.* O'Neill's affidavit included, among other things, the information that a dog handled by the Customs Service had responded positively to the packages. O'Neill Aff. ¶ 3, Rivera's Notice of Motion Ex. B. In the Second Circuit, such information is sufficient by itself to establish probable cause. *Glover,* 957 F.2d at 1013. The inclusion of the tip would merely have bolstered the conclusion that probable cause existed. Defendants respond that, because the confidential informant lacked a track record, the inclusion of the tip would have decreased, rather than increased, the likelihood that Magistrate Judge Castellano would find probable cause. Even if this contention were true, however, defendants would be entitled to a *Franks* hearing only if the tip would have cast such doubt on the existence of probable cause that, had he been aware of it, Magistrate Judge Castellano would have disregarded the positive identification of the packages by trained dogs and denied a warrant. Defendants offer no argument in support of this farfetched possibility. Because the affidavit submitted by O'Neill was sufficient to establish probable cause without the omitted information, and because there is no

reason to believe that its inclusion would have cast doubt on the existence of probable cause, defendants' request for a *Franks* hearing is denied.

### Conclusion

For the reasons stated above, defendants' motion to suppress the fruits of the search pursuant to the Puerto Rican warrants, and alternatively for a *Franks* hearing, is hereby denied, and a trial date is set for January 17, 1995.

SO ORDERED.