**UNITED STATES of America,**

v.

**Carlos TROCHE, Defendant.**

**No. 01 CR. 274(RWS).**

United States District Court,
S.D. New York.

Jan. 10, 2002.

Honorable James B. Comey, United States Attorney for the Southern District of New York, New York City, By Jonathan S. Kolodner, Diane Gujarati, Assistant United States Attorneys, Of Counsel.

Leonard F. Joy, the Legal Aid Society, Federal Defender Division, for Defendant, New York City, By Cecillia D. Wang, Of Counsel.

## OPINION

SWEET, District Judge.

Defendant Carlos Troche ("Troche") has moved (1) to suppress the physical evidence seized from his car on November 4, 2000, as well as any subsequent statements made by Troche on that date, because law enforcement officers lacked "reasonable suspicion" to stop him; (2) to suppress the physical evidence seized from his car because law enforcement officers did not have his consent to search his vehicle; (3) to suppress any statements Troche made to law enforcement on November 4, 2000 at the offices of the United States Customs Service ("Customs") because he was not advised of his *Miranda* rights and a reasonable person in his position would not have felt at liberty to leave; and (4) to suppress any statements made to law enforcement on March 8, 2001, following his arrest, because he was not advised of his *Miranda* rights. For the reasons stated below, the motion is granted in part and denied in part.

### Prior Proceedings

On March 27, 2001, Troche was charged in a one-count indictment with conspiracy to commit money laundering, in violation of 18 U.S.C.1956(h). On June 4, 2001, Troche filed the instant motion to suppress. After the parties made their respective submissions, an evidentiary hearing was held on November 1, 2001, at which parties requested and received leave to file post-hearing briefs. On December 26, 2001, the motion was marked fully submitted.

### Facts

On November 4, 2000, Detective Frank DiGregorio ("DiGregorio") of the Queens District Attorney's Office received a tip from Khalil Sayed ("Sayed"), a cooperating

witness who pleaded guilty to a money laundering charge in the United States District Court for the Eastern District of New York.[1] Sayed had previously provided information regarding individuals and companies involved in money laundering, but the information had later turned out to be too vague to be of use.

On the afternoon of November 4, 2000, however, Sayed informed DiGregorio that he had received a telephone call regarding a pick up of approximately $500,000 in drug proceeds from an individual in the vicinity of Broadway and West 72nd Street in Manhattan. The transaction was to occur that same evening at approximately 7:00 P.M. Based on Sayed's call, DiGregorio assembled a field team of agents and later met separately with the team and with Sayed. Pursuant to a plan devised by the field team, DiGregorio instructed Sayed to signal him with a nod when the delivery person made contact. Sayed was also able to provide information by cellular telephone, and was instructed to run away when agents approached to protect his identity and safety.

That evening, agents established their surveillance posts in the vicinity of West 72nd Street and Broadway, and Sayed took his post on the south side of 72nd Street between West End Avenue and Broadway. Between 8:00 and 8:30 P.M., after having waited about an hour, DiGregorio, who was standing due east of Sayed, observed Sayed on the telephone. Sayed then called DiGregorio and told him that the courier had arrived, and that he was in a Lincoln taxi. Meanwhile, Detective Matthew Murphy ("Murphy") of the New York City Police Department, who had been po-

sitioned on the north side of 72nd Street, had observed a black Lincoln Town Car circling the block a few times, and the driver, who was talking on a cellular telephone, appeared to be looking for someone. Special Agent Nelson Cortes ("Cortes") of the New York State Commission of Investigations also observed the Lincoln circling the area several times.

Eventually, Troche, the driver of the vehicle, performed an illegal U-turn on 72nd Street and approached the area in which Sayed was standing. Troche then illegally parked his car on the south side of 72nd Street. Sayed approached the car and engaged Troche in conversation through the passenger-side window. Sayed nodded to DiGregorio, who advised the field team that the target had been identified. Approximately eight armed agents then surrounded the car, and Sayed ran away pursuant to the pre-arranged plan. Several officers began speaking to Troche at the same time. Troche, who speaks Spanish but does not speak English, was asked for his driver's license and registration. He was also asked why he was at the location and why the individual standing at his window (Sayed) had run away. Troche responded that he was there to meet someone, but that he did not know why the person ran. When asked if the person who had run away was the person he was supposed to meet, Troche responded "no, I don't know" and claimed that he did not see the person run away. (Tr. at 19). Troche was directed to step out of the vehicle and was subjected to a pat-down search.

With Cortes present as a translator, Troche was asked if he had anything ille-

---

1. The facts of Sayed's arrest are relevant to the instant motion. Sayed was arrested on January 18, 2000 after police investigators had observed him in a transaction with other individuals suspected of drug money laundering. In March 1999, Sayed had met with two other individuals to pick up a black bag, which was transferred from the trunk of the courier's car to the trunk of Sayed's car. The bag was later found to have contained approximately $500,000 in narcotics proceeds. Sayed pleaded guilty on May 22, 2000 to conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(2)(B)(ii).

gal in the car, such as a gun or drugs, to which Troche responded that he did not. Troche then was asked whether the officers could search inside the car, and he consented. Following a search of the passenger compartment, DiGregorio asked Troche, "What about the trunk?" (Tr. at 20). In response, Troche pressed the trunk release button inside the vehicle to unlock the trunk door.

When the trunk was opened, the agents found a suitcase that contained a significant amount of United States currency, later determined to be approximately $500,000. The officers asked Troche whether he wanted a receipt for the currency, and he replied that he did. Troche was told that, in order to obtain the receipt, he would have to accompany them to the Customs offices at the World Trade Center.[2] Troche was told that he would have to be handcuffed for safety purposes on the trip to the Customs office.

The officers handcuffed Troche behind his back and put him in a police vehicle. Upon arrival at the Customs office, the officers drove Troche through a secure garage area, past a security guard and motorized barricade. The officers escorted Troche on a secure elevator to the El Dorado task force offices. Officers bypassed a publicly accessible reception area and took Troche to a secure arrest processing area across the hall. Troche was then placed in an interview room in the arrest processing area, which also contained a holding cell.

While in the interview room, Troche, who was no longer handcuffed, spoke with Agent Millie Martin ("Marin"). Marin asked Troche about his nationality and the two discussed several personal matters concerning his background. Troche was not given *Miranda* warnings prior to or during the questioning, but made several

inculpatory statements regarding the money that had been seized. At the hearing, Marin testified that Troche voluntarily stated this information, but that she would follow-up to clarify "a lot." (Tr. at 96, 101). A contemporaneous investigatory report by Cortes indicates that the officers "extensively debriefed" Troche. (Confidential Report by Sgt. Nelson Cortes dated Nov. 5, 2000). After the debriefing, the officers consulted with Assistant United States Attorney Nikki Kowalski, who determined that Troche would not be prosecuted at that time. At approximately 11:00 P.M., Troche was given a receipt for the money that had been seized and was permitted to leave.

On March 1, 2001, Murphy filed a criminal complaint against Troche based on the events of November 4, 2000. An arrest warrant was obtained, and Troche was arrested on March 8, 2001 while he was working. Troche was handcuffed, placed in a police vehicle, and transported to the Customs office at the World Trade Center, where he was processed. Troche was advised of his *Miranda* rights in Spanish and signed a waiver of those rights. Murphy and another officer who spoke Spanish administered the rights, and the Spanish-speaking officer explained what the rights were. Troche was then questioned about the events of November 4, 2000, and replied with inculpatory statements regarding his role in those events.

### Discussion

**I. The Officers Had Reasonable Suspicion to Stop Troche's Car on November 4, 2000 Based on the Circumstances Arising From the Expected Delivery of Narcotics Proceeds**

Troche's first contention is that the officers lacked reasonable suspicion to stop

---

**2.** According to Cortes' testimony, the officers "asked [Troche] that he would have to accompany us to our offices and we would give him a receipt for that currency." (Tr. at 119).

his car on November 4, 2000. Specifically, he argues that neither Sayed's tip on November 4, 2000 nor the alleged traffic violations committed by Troche justified the officers' stop.

 A police officer may briefly conduct an investigatory detention by stopping a person so long as the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir.1995) (*citing United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992)). *See also United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."); *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion" arises when the officer is aware of specific, articulable facts, which, together with the rational inferences drawn from those facts, reasonably warrant suspicion. *See Glover*, 957 F.2d at 1009. A court must determine whether there is reasonable suspicion under the totality of the circumstances, and "must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Colon*, 250 F.3d 130, 134 (2d Cir.2001) (*quoting United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.), *cert. denied*, 529 U.S. 1061, 120 S.Ct. 1571, 146 L.Ed.2d 474 (2000)). The test is an objective one, and "the subjective intentions or motives of the officer making the stop are irrelevant." *Bayless*, 201 F.3d at 133.

 In this case, the officers plainly had a reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. The primary source of the specific, articulable facts that provided rea-

sonable suspicion came from Sayed, the cooperating witness. Sayed pleaded guilty to a money laundering charge in the Eastern District of New York. The facts leading to his arrest are much like the facts here. In March 1999, Sayed met with two other individuals to pick up a bag containing approximately $500,000. The money came in a black bag, and was transferred from the courier's car to Sayed's car. Thus, when Sayed contacted DiGregorio on November 4, 2000 to inform him of the potential delivery of narcotics proceeds, DiGregorio and the members of his team had a context for evaluating the information provided by Sayed since Sayed was describing another transaction which was similar to the prior transaction for which Sayed had been charged. Sayed also provided the type of details to be expected in such a transaction: that approximately $500,000 would be delivered at Broadway and 72nd Street at approximately 7:00 P.M.

Beyond these initial facts, the events on November 4th took place in a manner consistent with Sayed's information. Between 8:00 and 8:30 P.M., DiGregorio observed Sayed on the telephone, and then learned from Sayed that the courier had arrived and was driving a Lincoln taxi. Murphy and other officers observed the black Lincoln in the vicinity, and Murphy specifically observed the driver appearing to search for someone and talking on a cellular telephone. Sayed was observed talking to the driver, Troche, and then Sayed gave DiGregorio a nod, which was the prearranged signal that the money was present. At this point, the officers, moved in, and Sayed ran away as planned.

Troche challenges the reliability of Sayed's tip based on his lack of a proven track record as an informer and the substance of his tip. However, an informant's record should not be discounted "'simply because he has no proven record of truth-

fulness or accuracy.'" *United States v. Canfield,* 212 F.3d 713, 719 (2d Cir.2000) (*quoting United States v. Wagner,* 989 F.2d 69, 73 (2d Cir.1993)); *see also United States v. Martinez,* 869 F.Supp. 202, 205 (S.D.N.Y.1994). As the Court of Appeals pointed out in *Wagner,* for purposes of establishing probable cause, "if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration." *Wagner,* 989 F.2d at 73.

Here, not only did the informant provide the tip, but he was a participant in the events leading up to the stop of Troche's car on the evening of November 4th. As a cooperating witness, he faced severe consequences for lying, including no credit for his assistance at sentencing and the possibility of additional felony charges for providing false statements to authorities.[3] As noted, Sayed provided detailed information to experienced agents regarding the time

place, and amount of proceeds to be delivered. He provided further information by cellular telephone while the agents were on surveillance. These details were corroborated by actual events: a Lincoln taxi, whose driver had been looking for someone, approached Sayed, at Broadway and 72nd Street, at approximately the time that Sayed told the agents the transaction would take place.[4]

In sum, the officers had a reasonable suspicion that criminal activity was occurring, and, therefore, the stop of Troche did not violate his Fourth Amendment rights.[5]

## II. The Search of the Trunk Was Consented To by Troche and Was Supported by Probable Cause

### A. Troche Consented to the Officers' Search of the Trunk

Troche next contends that the officers' warrantless search of his trunk was unrea-

---

**3.** The defendant argues that the timing of Sayed's tip is questionable given that he faced an imminent sentence of significant prison time. However, this does not necessarily weaken Sayed's credibility. If anything, Sayed had a motivation to be truthful and to provide information so that he could get credit pursuant to Section 5K1.1 of the United States Sentencing Guidelines at his upcoming sentencing.

**4.** The defendant cites *United States v. Bold,* 19 F.3d 99, 100 (2d Cir.1994) and *United States v. Walker,* 7 F.3d 26, 27 (2d Cir.1993) for the proposition that Sayed's tip did not provide the level of detail needed to establish reliability. However, unlike those cases, this is not a case involving an anonymous tipster who suffers no consequences for his actions. Rather, it involves a "face-to-face informant [who] must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *United States v. Salazar,* 945 F.2d 47, 50–51 (2d Cir.1991).

**5.** Although the Government claims that the officers' stop of Troche's car was reasonable based on his commission of two traffic infrac-

tions, this claim is not supported by the record. While DiGregorio, Cortes, and Murphy testified that they saw Troche make an illegal U-turn, none of the officers' contemporaneous documents, including Murphy's sworn complaint and detailed investigatory report, mentions any traffic violations. In fact, it appears that the Government's attorneys were not even informed of the alleged violations until after the motion to suppress was filed. Thus, it cannot be said by a preponderance of the evidence that the alleged illegal U-turn was, as a factual matter, the basis of the stop. As to the alleged double-parking violation, the officers concede that the engine of Troche's car was still running when they approached him, which was immediately after he pulled up and the informant bent down to speak with him through the passenger-side window. Under those conditions, which would not even constitute a traffic violation, *see* Rules of the City of New York, tit. 34, ch. 4, § 4–11 (stating exception for taxis temporarily stopping to pick up or discharge passengers), it cannot be said that a reasonable New York City officer would have stopped Troche for "double-parking."

sonable given that Troche did not consent to the search. For the following reasons, this claim is rejected.

■ It is well-settled that under the Fourth Amendment, a warrantless search is *per se* unreasonable, with a few well-delineated exceptions. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). If a defendant consented voluntarily to a search, then a warrantless search will be held to be lawful. *See id.* at 358, 88 S.Ct. 507. Whether consent was given voluntarily, rather than out of coercion or duress, is determined based on a totality of the circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854; *United States v. Kon Yu–Leung,* 910 F.2d 33, 41 (2d Cir.1990) ("the consent to search should be deemed valid if, given the totality of the circumstances, the consent was voluntarily given, and not the product of duress or coercion"). The government has the burden of proving voluntariness. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Price,* 599 F.2d 494, 503 (2d Cir.1979).

■ In this case, the evidence introduced at the hearing demonstrated that Troche consented to the search of his trunk. DiGregorio testified that, after searching the passenger compartment, he asked Troche "What about the trunk?" and that Troche pressed the button inside his vehicle to unlock the trunk. Both Murphy and Cortes testified that Troche assented to the search, and then pressed the button inside the vehicle to unlock the trunk door. Regardless of whether Troche was silent or in fact gave his verbal asset, the fact that Troche pressed the button to open the trunk without being ordered to do so is in itself an indication that Troche impliedly consented to the search. *See, e.g., United States v. Peterson,* 100 F.3d 7, 11 (2d

Cir.1996) (officers had consent to search bag when, in response to their request to examine the bag, the defendant "simply removed it and handed it to" the agent); *United States v. Arbalaez,* No. 98 Cr. 941(AGS), 1999 WL 980172, at *5 (S.D.N.Y. Oct. 27, 1999) (holding that defendant had consented to a search of his truck where defendant had unlocked his truck for the law enforcement officers); *United States v. Lee,* No. 96 Cr..299(RPP), 1996 WL 391877, at *4 (S.D.N.Y. July 12, 1996) (concluding that defendant impliedly consented to search of shopping bag by handing the bag to agents).

Troche argues that his consent was not voluntary because it was given under coercive circumstances. He points out that there were up to eight agents present, and that officers had blocked in Troche's car with at least three of their own vehicles. Troche also argues that he was given a pat-down search and, although he did not understand English, several officers were asking him questions with only Cortes serving as a translator. While these factors raise legitimate concerns about the voluntariness of Troche's consent, they are not dispositive in demonstrating that Troche's actions were a product of a coercive environment. Each of the agents who testified at the hearing stated that they did not have their guns drawn, that they were in plain clothes, and that their tone of voice was calm and conversational. Although DiGregorio and Murphy initially asked questions in English, they eventually spoke with Troche through Cortes, the only Spanish speaker among them. There was no showing that the officers raised their voices or issued orders to the defendant with respect to the search of the car. Under the totality of the circumstances, Troche's consent to the search of the trunk was voluntary. *See, e.g., United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46

L.Ed.2d 598 (1976) (affirming finding of voluntary consent where no overt force or threats, no promises and no other subtle coercion, consent not given at police station but on public street); *United States v. Moreno*, 897 F.2d 26, 33 (2d Cir.1990) (affirming finding of voluntariness while defendant was in custody, where consent made in public, not in interrogation room or at station house, where no physical or verbal abuse and no display of weapons, and consent did not come after prolonged detention, even where defendants' English was limited); *United States v. Juliano*, No. 99 Cr. 1197(AGS), 2000 WL 1206745, at *2–3 (S.D.N.Y. August 24, 2000) (consent voluntary where agents courteous, did not engage in intimidation, did not raise their voices, and did not make any threats or attempt to induce cooperation).

### B. *There Was Probable Cause to Search Troche's Trunk*

■ Although Troche's voluntary consent to the officers' search of the trunk is sufficient to deny the suppression of the physical evidence found therein, there is a second, alternative basis for denying Troche's motion even if it is concluded that the coercive circumstances preclude a voluntary consent. For the same reason that the officers had the specific, articulable facts necessary to conduct an investigatory stop of Troche's car, the officer's also had probable cause to believe that the car contained contraband and to search the car.

As the Court of Appeals explained in *United States v. Harwood*, "[a] warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband. If the probable cause extends to the entire vehicle, the agent may conduct a warrantless search 'of every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search.'" 998 F.2d 91, 96 (2d Cir.1993) (quoting *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982)); see also *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). To establish probable cause, the government must show that, under all of the circumstances, "there is a fair probability that contraband … will be found in a particular place." *Harwood*, 998 F.2d at 96 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

In this case, the facts sufficient to support a finding of reasonable suspicion, namely Sayed's tip and the corroboration thereof, also support a finding of probable cause to search the car. Sayed provided information to law enforcement regarding the delivery of $500,000 in narcotics proceeds at a particular time and place; he provided additional information by confirming to DiGregorio that the courier had arrived; and he spoke with the courier, Troche, and nodded to DiGregorio that the car contained the money.

Furthermore, events after the investigatory stop of Troche's car, but before the car was searched, provide additional support for a finding of probable cause. Troche was asked several questions during the stop. He was asked why he had pulled over, and he stated that he was there to meet someone. Troche was also asked if the cooperating witness, who had run away by this point, was the person he was supposed to meet, and he said "no, I don't know." (Tr. at 19). In addition, Troche stated that he did not see Sayed run away from the car. (Tr. at 115). These answers were evasive, given that Sayed ran away directly from Troche's car. These circumstances, combined with Sayed's direct involvement and the total corroboration of his statements to law enforcement, gave the officers probable cause to believe that

Troche was the livery cab driver who was meeting Sayed, and that Troche in fact knew that he was involved in illegal activity. *See United States v. Gama–Bastidas,* 142 F.3d 1233, 1239–40 (10th Cir.1998) (tip from informant that was visually corroborated by FBI established probable cause); *United States v. Rollack,* 90 F.Supp.2d 263, 269 (S.D.N.Y.1999) (informant's tip based on "substantial first-hand knowledge" that was ultimately corroborated by actual result of the search established probable cause for the search).

For the foregoing reasons, Troche's motion to suppress the evidence seized from his car on November 4, 2000 will be denied.

### III. *Troche's November 4, 2000 Statements at The Customs Offices Are Not Admissible*

Troche next argues that his statements of November 4, 2000 at the Customs offices should be suppressed because he was not advised of his *Miranda* rights, and a reasonable person in his position would not have felt at liberty to leave. Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 470, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), police officers must warn a suspect in custody of his right to counsel and right to remain silent prior to questioning. And even if a defendant is not in custody, his incriminating statements must be suppressed if they were given under coercive circumstances. *Tankleff v. Senkowski,* 135 F.3d 235, 242 (2d Cir.1998) (*citing Oregon v. Elstad,* 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). Under these standards, the statements of Troche made on November 4, 2000 must be suppressed.

The inquiry as to whether one has been placed in custody by law enforcement is " 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *Tankleff,* 135 F.3d at 243 (*quoting Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). The standard is an objective one in which a court must look to various factors, including: "whether a suspect is or is not told that she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the police, whether the suspect is searched, frisked, or patted down, and the length of the interrogation." *Tankleff,* 135 F.3d at 244 (citations omitted).

In this case, by the time Troche made his inculpatory statements, he had already been subject to a series of procedures indicating that he was in the physical custody of officers. At the site of the stop on 72nd Street and Broadway, Troche had been patted down and had his automobile searched. After being advised that he would have to accompany officers to the Customs office to obtain a receipt for the money seized from his car, Troche was handcuffed and placed in a police vehicle for transport to the World Trade Center, undergoing a procedure similar to that he encountered on March 8, 2001 when officers arrested him pursuant to a warrant. At the Customs office, Troche was escorted through a series of secured areas to an arrest processing area, where he remained for several hours. While the government insists the tone of the interview conducted in that area was amicable, Troche was extensively debriefed to the point that he provided minute details regarding his involvement in the events of November 4, 2000. It is undisputed that the officers did not give Troche *Miranda* warnings prior to or during the questioning.

Under these circumstances, no reasonable person in Troche's position would have felt at liberty to leave. Having been

in custody without being administered *Miranda* warnings, Troche's November 4, 2000 statements must be suppressed.

### IV. *Troche's Post–Arrest, Post–Miranda Statements on March 8, 2001 Are Admissible*

Troche argues that his March 8, 2001 statements should be suppressed as the fruit of an unlawful search and seizure committed on November 4, 2000. This claim is rejected.

 Unless "the circumstances surrounding [the defendant's] 'first' unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights," the "second" warned confession will be admissible. *Tankleff,* 135 F.3d at 244; *see also Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. Here, Troche concedes that he was administered *Miranda* warnings at some point during the questioning of March 8, 2001. Although Troche was in custody at the time of his inadmissible inculpatory statements on November 4, 2000, it cannot be said that the first statement "so taint[ed] the investigatory process that [the] subsequent voluntary and informed waiver is ineffective." *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. Almost five months had passed between the first statement and the second, warned admissions of March 8, 2001, giving him ample opportunity to reassess his situation. *See Id.; cf. United States v. Montana,* 958 F.2d 516, 519 (2d Cir.1992). Thus, the inadmissibility of the November 4, 2000 statements does not preclude the admissibility of the post-*Miranda* March 8, 2001 statements.

For these reasons, Troche's post-arrest statements of March 8, 2001 given after he received *Miranda* warnings will not be suppressed.

### *Conclusion*

For the foregoing reasons, the physical evidence seized from Troche's automobile on November 4, 2000 and Troche's post-*Miranda* statements of March 8, 2001 will not be suppressed. However, the motion to suppress Troche's inculpatory statements on November 4, 2000 in the Customs offices is granted given that Troche was in custody at the time and had not been administered his *Miranda* rights.

Trial will be scheduled to begin February 4, 2001 or earlier, subject to the availability of counsel.

It is so ordered.