**UNITED STATES of America**

v.

**Isidro RAMIREZ**

**No. CRIM. L–02–26.**

United States District Court,
S.D. Texas,
Laredo Division.

Feb. 15, 2002.

Isidro Ramirez, pro se.

Joseph Ronald Barroso, Corpus Christi, TX, for Isidro Ramirez, Defendant.

James Mack Noble, IV, U.S. Attorney's Office, Laredo, TX, for U.S.

### MEMORANDUM AND ORDER

KAZEN, Chief Judge.

On January 28, 2002, Defendant filed a Motion to Suppress Illegally Obtained Evidence. (Docket No. 5). A hearing was held on February 6, 2002. After the hearing, the Court instructed the parties to submit further written arguments no later than February 15, 2002. Both parties have done so. (Docket Nos. 11, 12).

### I. Statement of Facts

On December 14, 2001, Trooper Jose A. Ramirez of the Texas Department of Public Safety was traveling southbound on IH–35 when he observed Defendant driving northbound in a green pick-up truck. Because it appeared to Trooper Ramirez that Defendant was not wearing his safety belt, he turned around and began to follow him. While following Defendant for approximately two to three miles, Trooper Ramirez observed the right tires of Defendant's truck cross over the solid white shoulder stripe two times, for approximately four to five seconds each time. Trooper Ramirez then drove parallel to Defendant's truck. Defendant was wearing his safety belt at that time. However, Trooper Ramirez decided to stop Defendant for two reasons. First, he believed Defendant had committed a traffic violation by failing to maintain a single lane of traffic. Second, he was concerned that Defendant was either intoxicated or fatigued.

After Defendant pulled off the road, he exited the truck and walked back to meet Trooper Ramirez. Trooper Ramirez testified that Defendant was acting very nervous, which was apparent on the video tape of the traffic stop. (Gov't Exh. 2). Defendant fumbled through his wallet when asked for his driver's license, was very talkative, and was stuttering as he spoke. When Trooper Ramirez informed Defendant that he stopped him because Defendant was weaving off the highway, Defendant stated that he was driving near the shoulder because he was "empty" and was headed to Cotulla to get "diesel." He stated that he did not want the truck to shut off in the middle of the road. The truck had a large diesel tank resting in its bed. Defendant told Trooper Ramirez that his truck ran on regular gasoline, and that the diesel tank was used for some tractors at the ranch where he worked. According to Defendant, he had just come from working at the ranch. When asked who he worked for, Defendant first said that he worked for "this guy," then stated that he worked for "the company," and finally stated that he thought his boss's name was Roger Cruz. When asked where he bought the truck, Defendant had to think about it for a while before giving an answer, and even then he was not certain of the name of the car dealer or its location.

After a few brief questions, Trooper Ramirez performed a safety sweep of the truck to ensure that there were no other people in it. While doing so, he observed that the truck's gas gauge showed that the tank was half full. He also observed that one of the wheel wells in the bed of the truck had several scratches and indentations on it, as if it had been subjected to repeated blows with a heavy object. While walking back toward the rear of the truck, Trooper Ramirez tapped his hand against the diesel tank. It sounded solid,

like it was full. He also noticed that the diesel tank was not bolted down.

Trooper Ramirez advised Defendant that he was going to issue him a warning for failure to maintain a single lane of traffic. After retrieving the warning form from his patrol car, Trooper Ramirez conversed further with Defendant while he was completing the form. Upon completion of the warning form, Trooper Ramirez placed it on the hood of his patrol car, and then retrieved a consent to search form. After Defendant signed the warning form, Trooper Ramirez asked for consent to search the truck. Defendant consented, and signed the written consent form. The search uncovered marijuana stored in the diesel tank.

## II. *Discussion*

Defendant contends that the initial stop of his truck was illegal, and therefore any evidence obtained as a result of the stop should be suppressed. The Fourth Amendment protects against unreasonable government seizures of persons or property. *See* U.S. CONST. amend. IV; *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). There is no question that Defendant was seized when his truck was stopped. *See United States v. Jones*, 234 F.3d 234, 239 (5th Cir.2000). The question, therefore, is whether that seizure was unreasonable. Seizures of motorists are analyzed under the framework for investigative detentions established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Sharpe*, 105 S.Ct. at 1573; *United States v. Shabazz*, 993 F.2d 431, 434–35 (5th Cir.1993). The Court must engage in a dual inquiry: 1) whether the officer's action was justified at its inception; and 2) whether the stop was reasonably related in scope to the circumstances that justified the initial interference. *See Jones*, 234 F.3d at 240.

### A. *Initial Stop*

The stop was justified at its inception if Trooper Ramirez had a reasonable suspicion, grounded in specific and articulable facts, that Defendant was involved in illegal activity. *See id.* at 239; *United States v. Campbell*, 178 F.3d 345, 348 (5th Cir. 1999).

### 1. *Failure to Maintain a Single Lane of Traffic*

■ Section 545.060 of the Texas Transportation Code states in pertinent part: "(a) an operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely." TEX. TRANSP. CODE ANN. § 545.060(a) (Vernon 1999). Defendant's contention that this statute is violated only when the vehicle's movement is unsafe appears to be correct. *See State v. Cerny*, 28 S.W.3d 796, 800–01 (Tex.App.—Corpus Christi 2000); *Ehrhart v. State*, 9 S.W.3d 929, 930 (Tex.App.— Beaumont 2000); *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex.App.—Austin 1998). The issue, however, is not whether Defendant actually violated the statute, but whether it was reasonable for Trooper Ramirez to believe he had violated it.

In *Hernandez*, the court held that a single instance of crossing a dividing line between lanes did not give rise to reasonable suspicion that the driver had violated § 545.060. *See Hernandez*, 983 S.W.2d at 870–71. In *Martinez v. State*, 29 S.W.3d 609, 611–12 (Tex.App.—Houston 2000), however, the court upheld the stop of a defendant under § 545.060 based on a single swerve onto the shoulder of the highway. The court held that it was reasonable for the trooper to conclude that the swerve was unsafe because the traffic on the highway at that time was "moderate to heavy." *See id.* at 612. Moreover, several

opinions have distinguished *Hernandez* in cases involving more than one swerve. *See Cook v. State*, 63 S.W.3d 924,928–29 (Tex.App.—Houston, 2002) (upholding a stop under § 545.060 where the defendant was "constantly" crossing over the broken white line); *Guevara v. State*, 2001 WL 1002468, at *2–3 (Tex.App.—Corpus Christi, June 21, 2001) (upholding stop for failure to maintain single lane of traffic where the defendant had crossed the solid white shoulder stripe three times); *Le-Card v. State*, 1999 WL 1018162, at *3–4 (Tex.App.—Houston, Nov. 10, 1999) (upholding stop under § 545.060 where the defendant crossed the shoulder stripe two times). In *Cook,* the court suggested that the presence of other vehicles on the roadway is immaterial, and concluded that weaving out of one's lane more than once "is sufficiently unsafe so that the officer was not required to wait until appellant placed himself or others in immediate peril as a result of his erratic driving." *See Cook,* 63 S.W.3d at 928–29. With this case law as his guidance, it was reasonable for Trooper Ramirez to believe that Defendant had violated § 545.060 by crossing over the shoulder stripe two times during a period of steady traffic.[1]

2. *Suspicion of Intoxication or Fatigue*

 Even if Trooper Ramirez's belief that Defendant had violated § 545.060 were unreasonable, the stop was valid based on his reasonable suspicion that Defendant was either intoxicated or fatigued. In both of the cases cited by Defendant, the court expressly stated either that the issue of driving while intoxicated was not raised, or that there was no evidence that the officers suspected the defendants might be intoxicated. *See Ehrhart,* 9 S.W.3d at 930; *Hernandez,* 983 S.W.2d at 870; *see also Cerny,* 28

S.W.3d at 799 ("[The officer] did not stop appellee for any other reason than failure to maintain a single lane."). In contrast, Trooper Ramirez testified that when he observed Defendant swerving out of his lane, he suspected that Defendant might be intoxicated or fatigued. In *Gajewski v. State,* 944 S.W.2d 450, 451 (Tex.App.—Houston 1997), a Houston Police Officer stopped the defendant after observing his vehicle weaving between lanes of traffic. After the defendant failed a series of field sobriety tests, he was arrested for driving while intoxicated. *See id.* The defendant argued that the stop was illegal because there was no evidence that his behavior affected the safety of other motorists, and therefore did not violate any traffic law. *See id.* at 452. In rejecting the defendant's argument, the court stated:

> [T]here is no requirement that a particular statute is violated in order to give rise to reasonable suspicion. Although not an inherently illegal act, when the officer observed appellant's car weaving between traffic lanes, reasonable suspicion existed to believe appellant was driving the motor vehicle while intoxicated, or that some activity out of the ordinary is or has occurred, so as to justify the temporary stop of defendant's car.

*Id.* Similarly, when Trooper Ramirez observed Defendant's vehicle cross the solid white shoulder stripe twice within a short distance, it was reasonable for him to suspect that Defendant was intoxicated or otherwise incapacitated. *See Guevara,* 2001 WL 1002468, at *3 (holding that drifting over the shoulder stripe three times gave rise to reasonable suspicion of intoxication); *Le Card,* 1999 WL 1018162, at *3 (concluding that crossing the shoulder

---

1. The video tape of the instant traffic stop shows that traffic on IH–35 was steady at the time. *See* Gov't Exh. 2.

stripe twice was "consistent with a person who was driving while intoxicated.").

Furthermore, Trooper Ramirez testified that when he observed Defendant's erratic driving, he was concerned for the safety of both Defendant and the public. As the Government points out, Texas courts have recognized the function of a police officer as a "community caretaker." "As part of his duty 'to serve and protect,' a police officer may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help." *Wright v. State,* 7 S.W.3d 148, 151 (Tex.Crim.App.1999); *see also Corbin v. State,* 33 S.W.3d 90, 94 (Tex.App.—Texarkana 2000). The following factors are relevant to this analysis: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and (4) to what extent the individual—if not assisted—presented a danger to himself or others. *See Corbin,* 33 S.W.3d at 94; *Wright,* 7 S.W.3d at 152. The ultimate determination is based on the totality of the circumstances. *See Corbin,* 33 S.W.3d at 95.

While the foregoing factors do not neatly fit the instant case, nevertheless the Court takes judicial notice that intoxication or fatigue of drivers on a busy interstate highway creates a significant risk of serious injury. This is especially true if the driver is alone. A highway patrolman would be remiss. if he did not decide to at least investigate the situation further. Thus, the initial stop of Defendant's vehicle was also justified pursuant to Trooper Ramirez's community-caretaker function.

### B. *Scope of Detention*

Defendant also argues that even if the initial stop of the truck was valid, Trooper Ramirez exceeded its permissible scope. The permissible scope of an investigative detention is defined by its purpose. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *United States v. Dortch,* 199 F.3d 193, 198 (5th Cir.1999). Here, the purpose of the stop was to determine why Defendant failed to maintain a single lane of traffic. Thus, the period of the detention up to the point when Trooper Ramirez had finished preparing a warning form was legitimate. *See United States v. Kelley,* 981 F.2d 1464, 1469 (5th Cir.1993) (stating that during a traffic stop, the officer is entitled to request a driver's license and registration, run a computer check, and issue a citation). This occurred approximately seven minutes after the stop. (Gov't Exh. 2). However, Trooper Ramirez did not have Defendant sign the warning form until approximately ten minutes after the stop. (Gov't Exh. 2). Defendant argues that these three minutes of delay impermissibly extended the detention, and that his consent to search, which was obtained after Defendant signed the warning form, was therefore invalid. This argument has superficial merit under the reasoning of *Dortch* and *Jones. See Jones,* 234 F.3d at 241 (holding that extending a detention three minutes past completion of a computer check violated the Fourth Amendment); *Dortch,* 199 F.3d at 198. However, by the time Trooper Ramirez had completed the warning form, he had acquired additional reasonable suspicion that Defendant was engaged in illegal activity.

If during the course of a valid investigative detention an officer develops additional reasonable suspicion that the detainee is engaged in criminal activity, the officer may prolong the detention. *See United States v. Valadez,* 267 F.3d 395, 398. (5th Cir.2001); *Jones,* 234 F.3d at 241. To determine whether Trooper Ramirez had reasonable suspicion to justify Defendant's continued detention, the Court must look at the totality of the circumstances and

consider the officer's knowledge and experience. *See Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *Jones*, 234 F.3d at 241. As soon as he began speaking with Defendant, Trooper Ramirez noticed that Defendant was very nervous. During their conversation, Defendant made several inconsistent statements. For example, Defendant claimed that he had just come from working on a ranch. However, he had difficulty identifying his employer. Moreover, Trooper Ramirez noticed that Defendant's clothes were clean, which was contrary to Trooper Ramirez's personal experience working on ranches. In addition, although Defendant said he was going to get diesel because his truck was empty, he later stated that his truck ran on gasoline. When Trooper Ramirez performed a safety sweep of the truck, he observed that the gas gauge read half full. He subsequently tapped the diesel tank, and it also sounded like it was full. Trooper Ramirez observed that the diesel tank was not bolted to the truck. He testified that, in his experience, most ranchers bolt this type of tank down. He further testified that he thought it was strange that Defendant would use his own personal truck to transport the diesel tank for his employer. Additionally, it appeared to Trooper Ramirez that the scratches and indentations on the wheel well were caused by repeatedly tilting the diesel tank toward the back of the truck. He testified that he knew from experience that there would be no reason to tilt the tank in such a way because the fuel is inserted and removed by hoses through the top of the tank. Drawing from what he had seen in a training film at the police academy, and had heard from fellow officers, Trooper Ramirez associated these circumstances with the smuggling of drugs through a trap door on the underside of the diesel tank. Based on the totality of the above circumstances, Trooper Ramirez acquired sufficient suspicion that Defendant was engaged in the trafficking of a controlled substance to justify his continued detention after the warning citation was completed.

Assuming, *arguendo*, that the only permissible basis for the initial stop was Trooper Ramirez's suspicion that Defendant was intoxicated or otherwise incapacitated, the scope of the detention would still be reasonable. Trooper Ramirez had spoken to Defendant for approximately three and a half minutes at the moment he began the safety sweep of the truck. Such a brief encounter is certainly not excessive when observing a person's demeanor and speech patterns to determine if he is intoxicated. Moreover, the safety sweep itself was authorized because officers may take steps necessary to protect their personal safety during an investigative detention. *See Campbell*, 178 F.3d at 348–49. As explained above, upon completion of the safety sweep, Trooper Ramirez had acquired additional reasonable suspicion to justify Defendant's continued detention.

### C. *Consent to Search*

▮ Defendant further argues that his consent to search the truck was invalid because it was given during an illegal detention. Because the stop was legitimate both at its inception and in scope, this argument fails. There is no dispute that Defendant consented to a search of his truck. He gave his oral consent as soon as Trooper Ramirez asked, and signed the consent form immediately thereafter. For consent to be valid, however, it must be voluntary. The voluntariness of one's consent is determined by analyzing six factors: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence;

and 6) the defendant's belief that no incriminating evidence will be found. *See Jones,* 234 F.3d at 242. No single factor is dispositive. Rather, the ultimate determination of voluntariness is based on the totality of the circumstances. *See id.; United States v. Gonzales,* 79 F.3d 413, 421 (5th Cir.1996).

The first and fourth factors weigh in Defendant's favor. Defendant, although not under arrest, was being detained, and there is nothing in the record to indicate that Defendant was aware of his right to refuse consent. It is not clear which way the sixth factor leans. Although Defendant likely knew that there was marijuana in his truck, the manner in which it was stored inside the diesel tank may have caused him to believe that Trooper Ramirez would not discover it. The rest of the factors all weigh in favor of voluntary consent. Trooper Ramirez employed no coercive procedures, and Defendant cooperated with Trooper Ramirez during the entire encounter. While Defendant did not testify and there is no evidence of the extent of his education, the video tape reflects that he possessed sufficient intelligence to understand what he was doing when he consented to the search. Under the totality of the circumstances, the Court finds that Defendant's consent was voluntary.

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED**.