**UNITED STATES of America, Plaintiff,**

v.

**Eric GAGNON, Defendant.**

**No. 02–CR–127.**

United States District Court, N.D. New York.

Nov. 6, 2002.

Joseph A. Pavone, United States Attorney, Northern District of New York, Albany, NY (Carlos A. Moreno, Asst. United States Attorney, of counsel) for Plaintiff.

Gerstenzang, O'Hern, Hickey & Gerstenzang, Albany, NY (Thomas J. O'Hern, of counsel), for Defendant.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Defendant Eric Gagnon ("Gagnon" or "the defendant") was charged in a two-count superseding indictment, filed on September 13, 2002, with conspiracy to possess with intent to distribute, and distribution of, marijuana in violation of 21 U.S.C. § 846, and attempt to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841, 846. The defendant, as part of an omnibus motion, moved to suppress the evidence seized from his tractor trailer. After narrowing the issue to whether the defendant voluntarily consented to the search of his tractor trailer, a suppression hearing was held on August 15, 2002 and August 23, 2002 in Utica and Albany, New York.[1] Decision was reserved.

## II. FINDINGS OF FACT

The following are the findings of fact, taken from the two-part hearing on Gagnon's motion to suppress evidence. All citations herein are to the transcript of that hearing.

Gagnon is from the predominantly French-speaking Canadian province of Quebec. (Tr., p. 163). He grew up in a French-speaking household, and attended French-speaking schools until he was sixteen years of age, at which time he dropped out. (Tr., pp. 164–65, 201). He had no formal English training (Tr., pp. 165, 202).

At the age of eighteen, Gagnon began a career as a commercial truck driver. (Tr., p. 175). He has been a truck driver for the past sixteen years, with the exception of approximately a five-year span of time in which he lived exclusively in Quebec. (Tr., pp. 175, 199). His employment as a truck driver very occasionally brings him into the United States. (Tr., pp. 175, 204). Though he obviously has difficulty understanding and expressing himself in the English language, he has been able to pick up small tidbits of the language at American truck stops. (Tr., pp. 165, 202).

Gagnon entered the United States a very short time prior to April 4, 2002. (Tr., p. 193). One night he stayed in a Long Island, New York hotel room. (Tr., p. 194). His conversation with the hotel clerk was in English, but it is unclear whether such conversation simply consisted of him just handing his commercial driver's license to the clerk. (Tr., p. 195). At some point, he ate a meal at a McDonald's restaurant. (Tr., p. 196). He ordered a "number five" meal from the picture menu above the cash registers. (Tr., p. 196). The meal, number, and picture of the "number five" he ordered correspond with those found in McDonald's

---

1. Testifying for the government were Anthony Miserendino, Daniel G. Sullivan, and Todd M. Harris. The defendant and his brother, Daniel Gagnon, testified for the defense. On Oc-tober 4 and 7, 2002, after receipt of a transcript of the suppression hearing, the parties filed memoranda of law.

restaurants in Quebec, except that the menus in Quebec are in French. (Tr., pp. 196, 202).

On April 4, 2002, Daniel Simoneau ("Simoneau") was arrested as he attempted to enter the Port of Champlain entry into the United States. (Tr., p. 113). Found in Simoneau's tractor trailer were 144 pounds of marijuana. (Tr., p. 113–14). Simoneau informed United States Customs Service agents that the tractor trailer was to be delivered to a person named "Eric Gagnon" at the Fox Run restaurant and motel off Exit 21B of the New York State Thruway. (Tr., p. 114). Simoneau gave the agents a description of the vehicle that Gagnon was supposed to be driving. (Tr., p. 114).

United States Custom Services Special Agent Todd Harris ("Agent Harris" or "Harris"), working in Albany, New York, received a call from his supervisor "somewhere around" 6:00 p.m. on April 4, 2002, informing him of Simoneau's claims. (Tr, p. 113). Agent Harris passed the information to New York State Police Sergeant Anthony Miserendino ("Sgt. Miserendino" or "Miserendino"), who in turn passed the information on to the New York State Police trooper who was responsible for patrolling that section of the Thruway, Trooper Roy Swan ("Tr. Swan" or "Swan"). (Tr., p. 8). Tr. Swan was informed that the tractor trailer that "Eric Gagnon" was supposed to be driving had the word "Lanfort" written on the side of the trailer. (Tr., p. 9).

At approximately 7:20 p.m. on that same night, Tr. Swan called Sgt. Miserendino back and informed him that a tractor trailer matching the description had just pulled into the Fox Run rest area off Exit 21B. (Tr., pp. 114, 166). Miserendino instructed Swan to maintain visual surveillance until he and Harris arrived at the rest area. (Tr., p. 9). It was an eighteen to twenty mile trip from the Albany station where Miserendino and Harris were to the rest area off Exit 21B. (Tr., p. 57–58). It took them a total of fifteen to twenty minutes from the time Swan called to the time they arrived at the rest area. (Tr., p. 131).

Meanwhile, Gagnon, upon arrival at the rest area, wandered around the complex[2] looking for a jacket he had left there the last time he had stopped at Fox Run. (Tr., p. 166). He found the waitress who was there the previous time, when he lost the jacket, and asked her, in what little English he knew, and with signals and signs, if she had the jacket. (Tr., p. 177). He then went into the motel registration area of the complex, and spoke to clerk Daniel Sullivan. (Tr., p. 83). Gagnon had rented a room at the motel before, and had been to the complex upwards of fifty times. Whenever someone checks in at the motel, a registration card is filled out. On the card, the only information the clerk requires the truck driver to fill in is his name, address, and the company for which he works. Gagnon can read the English word "name," and the words "address" and "company" are the same or near the same in English and French. (Tr., pp. 179–80). According to the clerk, Gagnon's English was "broken," but he was personally aided in understanding the defendant because, through his employment as a motel clerk, he had dealt with many Canadian truck drivers who spoke the same way. (Tr., pp. 83–84).

In the past, when Gagnon had rented rooms at the motel, the usual practice was that he would give the clerk working that day his commercial driver's license and the clerk would fill out a registration card. (Tr., p. 179). On the day in question, he

2. The complex has at least two buildings. One building is made up of three major parts: a restaurant, an area where billing for fuel and motel transactions are completed, and a bar. (Tr., p. 81). The motel is in a separate building. (Tr., p. 83).

was asked where he was from, and he handed the clerk his commercial driver's license. (Tr., p. 178). He filled out the required fields on the card. The week before the suppression hearing, the clerk was requested, at the behest of the United States Attorney's Office, to try and locate Gagnon's registration card. (Tr, p. 151). The clerk spent two days looking for the card, but was unable to locate it. (Tr, p. 88). After the registration card was filled out, and Gagnon had been shown and paid the room rate, the clerk gave him the keys to the room. (Tr., p. 92). The defendant went to his motel room to make sure it was clean, and then proceeded into the restaurant for dinner. (Tr., pp. 166, 182).

Sgt. Miserendino and Agent Harris arrived at the rest area between 7:40 and 7:45 p.m. They located the only vehicle matching the description, a 2002 tractor trailer with the word "Lanfort" written on the trailer, parked in the rear of the rest area parking lot. (Tr., p. 9–10). By or around this time, Miserendino and Harris were joined by Tr. Swan and three other New York State Police troopers. (Tr., p. 11). All officers except Harris were in uniform, with sidearms holstered. (Tr., p. 11). Harris was in civilian clothes, with his weapon concealed under a black leather jacket. (Tr., p. 122). Miserendino at some point shined his flashlight into the cab area of the truck, and tried to open the driver's side door, which was locked. (Tr., p. 13). Opening the passenger's side door of the cab "could have been tried by another officer." (Tr., p. 64). The officers determined the truck was not running, as many others in the lot were, and that there was no one inside. (Tr., p. 10). The group was at the truck for a total of at least ten minutes. (Tr., p. 133).

At or just before 8:00 p.m., Sgt. Miserendino, Agent Harris, and a trooper walked into the building housing the motel registration area. (Tr., p. 13). Of the three that remained behind, one stayed by the tractor trailer and the other two sat in police cars in the parking lot. (Tr., p. 65). Miserendino, Harris, and the trooper were standing in a hallway outside the motel registration area for approximately seven to fifteen minutes, discussing what they should do. (Tr., p. 101). At this point, the clerk, Sullivan, came into the hallway and asked if they needed help. (Tr., p. 94). Miserendino asked him if he had any contact with an "Eric Gagnon." (Tr., p. 14). Sullivan informed him that Gagnon had just checked in a short time ago. (Tr., pp. 14, 96). The clerk brought the officers over to the registration desk and showed them a copy of a master sheet with all the names and room numbers of guests checked into the motel. (Tr., p. 14, 96). The officers did not ask to see Gagnon's registration card. (Tr, p. 96). Sullivan then entered the restaurant, ostensibly to return some dishes, and observed the defendant sitting at a booth in the rear. (Tr., p. 98). Sullivan returned and informed the officers of Gagnon's location. (Tr., p. 102).

In the hallway, the officers discussed their options. Agent Harris placed a telephone call to the United States Attorney's Office to ask what would occur if Gagnon were to refuse to allow them to search his tractor trailer. (Tr, p. 117). An Assistant United States Attorney informed him that if the defendant so refused, the officers would be forced to leave because they had no probable cause to search the tractor trailer without a search warrant, and no probable cause to obtain a search warrant. (Tr., p. 117–18).[3] Harris then informed Sgt. Miserendino and the trooper that unless the defendant gave consent to search

---

**3.** At first, Agent Harris claimed that he was told they would not have probable cause to

search the tractor trailer. (Tr., p. 117). La-

the tractor trailer, they would be forced to leave. (Tr., p. 136).

At approximately 8:30 p.m., Sgt. Miserendino, Agent Harris, and the trooper entered the restaurant. (Tr., pp. 15–16, 59). The restaurant was "sparsely populated," and Gagnon was immediately located, sitting alone at a booth along the window in the back of the restaurant in the area indicated by Sullivan. (Tr., p. 17). The window looked out onto the Thruway. (Tr., p. 66–67). The three officers approached Gagnon, with Miserendino and the trooper standing directly in front of the booth, and Harris a few feet behind them. (Tr., pp. 20, 119). All three had their weapons holstered. (Tr., p. 20).

Miserendino asked Gagnon if he was Eric Gagnon. (Tr., p. 19). Gagnon, upon hearing his name, said "yes." (Tr., p. 183). Upon Miserendino's request, the defendant produced his Canadian commercial driver's license. (Tr., p. 20–21, 168). Miserendino took the license and did not give it back to him. (Tr., p. 168). Miserendino asked Gagnon what he was doing at the rest area. (Tr., p. 21). Gagnon communicated something to the effect that he was resting, and that he would be travelling to Albany to pick up some recyclable goods. (Tr., p. 22). Miserendino asked Gagnon if he knew a "Daniel Simoneau." (Tr., p. 23). Upon hearing the name "Daniel," but not together with the name "Gagnon," Gagnon responded "Daniel Gagnon, my brother I know." (Tr., p. 187). Miserendino then continued to ask Gagnon if he knew Simoneau and Gagnon continued to respond that Daniel Gagnon was his brother. (Tr., p. 23). Miserendino then informed Gagnon, in an authoritative tone of voice, that the officers wanted to see his tractor trail-

er. (Tr., p. 168–69). Gagnon was not told why the officers wanted to see his tractor trailer. (Tr., p. 174). This conversation lasted no longer than five minutes. (Tr., pp. 73, 129).

The prosecution, and all of its witnesses, claim that Gagnon consented to the search of his tractor trailer. The New York State Police have a field manual for officers. One form, designated a "general eight," is the consent to search form used by the state police. (Tr., p. 49–50). The field manual also mandates that before an officer has a suspect sign a consent to search form, the suspect be informed of his right to refuse such consent. (Tr., p. 50–51). It is not disputed that the consent to search form was not used on the night in question. (Tr., p. 50). It is not disputed that at no time did any officer inform Gagnon that he had the right to refuse to consent to a search of his tractor trailer. (Tr., p. 51).

Five to ten minutes before 9:00, Gagnon left the restaurant with the officers and proceeded to the tractor trailer. (Tr., pp. 170). All six officers were present at the tractor trailer. (Tr., p. 28). The defendant unlatched a mechanism at the back of the trailer. (Tr., pp. 28, 170). Without asking permission, one of the troopers opened up the right-hand truck door. (Tr., p. 170). Gagnon did not object because he believed the officers just wanted to verify that the trailer was empty. (Tr., p. 188–89). Two troopers climbed into the trailer and looked around. (Tr., p. 29). After a cursory review, it was apparent that the trailer was empty.

Sgt. Miserendino then ordered Gagnon to unlock the cab, or tractor, part of the vehicle. (Tr., p. 171).[4] Gagnon walked to

---

ter, he claimed that he was told they did not have the probable cause necessary to obtain a search warrant. (Tr., p. 135). In sum, the probable cause necessary for any legal action was, at that point, absent.

**4.** Sgt. Miserendino claims that he asked Gagnon's permission to search the cab, and that Gagnon consented, without delay, in English. (Tr, pp. 29–31). Misrendino claims he asked

the driver's side door of the cab, inserted a key, unlocked the door, and pulled it open. (Tr., pp. 32, 171). Without a word, Miserendino climbed into the cab and gave the front portion of the cab a cursory review. (Tr., pp. 33, 172). At this point, the defendant attempted to intervene. He tried to tell Miserendino to get out of the cab, making gestures and attempting to follow the sergeant inside. (Tr., p. 173). He was restrained by the other officers. (Tr., p. 173). At some point, Gagnon mentioned that he did not want the inside of the tractor to get dirty, but it was clear that he did not want Miserendino fully entering the cab. (Tr., p. 173). Less than a minute after he entered the cab, Miserendino proceeded to the rear portion of the cab. (Tr., p. 146).

Sgt. Miserendino observed a blue duffel bag in an open storage area under the bed. (Tr., p. 34). The bag was zippered shut. (Tr., p. 35). He grabbed the bag from the outside "to get an idea if it had clothing in it because [Gagnon] had said he was carrying clothes and some stuff, and I came to the determination that it definitely was not filled with clothing." (Tr., p. 34–35). This determination was reached because it "felt like there was some sort of paper product or books or something of a hard nature inside the bag and definitely not clothing." (Tr., p. 35). Although he had not asked for permission to open the bag, he unzipped it and opened the top. (Tr., p. 35). Inside the duffel bag were plastic bags, some clear, some opaque. (Tr., p. 35). The clear plastic bags contained United States currency, as did the opaque bags upon later inspection. (Tr., p. 35).

At 9:00 p.m., Sgt. Miserendino seized the currency and ordered a trooper to secure Gagnon. (Tr., p. 36). He placed the currency in the trunk of his police car and locked it. (Tr, p. 37). The defendant was handcuffed and placed in the front seat of one of the New York State Police vehicles. (Tr., p. 37). Agent Harris called the United States Attorney's Office again and was told the matter would be prosecuted in federal court. (Tr., p. 149). Harris read the defendant his Miranda rights and asked him if he wished to waive those rights. (Tr., p. 126). Gagnon indicated to

Gagnon if he "could take a look inside the tractor." (Tr., p. 29). He later says he asked Gagnon if he could "just take a look in, and he said yes, you could look in," "can I take a look... is it all right if we look inside the cab?" (Tr., pp. 30, 63). Accepting that testimony as credible, asking permission to "look inside" or to "take a look in" to a non-English speaking person without an interpreter can hardly form the basis for a consent to a search. In view of Miserendino's other testimony, it is doubtful that even this "consent" actually took place as described. For example, he at first testified that the trailer of Gagnon's tractor trailer had a type of door that slid up to the roof. (Tr., p. 28). He later admitted that he could be mistaken, and both Agent Harris and the defendant claimed the trailer had double doors that swung open. (Tr., pp. 44, 144–45). Further, Miserendino claimed that photographs of the items seized were not taken at the scene, but Harris credibly testified that photos were taken. (Tr., pp. 68, 126). Miserendino also claims that he had no idea whether the matter, if a seizure of contraband resulted, would be prosecuted in federal or state court. He was aware, however, of the somewhat continuous communications with the United States Attorney's Office. In addition, Misrendino did not write down anything the night of the events in question, nor did he subsequently make any type of written report, with the exception of a short affidavit he filled out. (Tr., p. 48). Said affidavit did not contain several facts to which he testified. (Tr., p. 49). Agent Harris' testimony is more credible than Miserendino's. However, he, too, did not write down any information the night of the events in question, and could not remember when he made his written report. (Tr., p. 147). Four months had passed from the time the events in question took place and both Harris and Miserendino testified. Clearly, the government has failed to prove by a preponderance of credible evidence this alleged verbal "consent."

Harris that he did not understand. (Tr., p. 126). Harris asked if he would feel better if an interpreter was present, and the defendant indicated in the affirmative that he would. (Tr., p. 126). According to Harris, "[h]e didn't undertstand the wording is what I thought he was referring to." (Tr., p. 127). Five to ten minutes elapsed from the time the group left the restaurant to the time the defendant was secured. (Tr., p. 74). Miserendino and another trooper continued to search the cab of the tractor trailer and found one additional plastic bag of currency in a side storage compartment. (Tr., p. 37).

The New York State police field manual also mandates the use of a "general nine" form when items are seized pursuant to a search warrant or consent to search. (Tr., p. 77). The form is used to inventory the items so seized. (Tr., p. 77). No such form was filled out on the night in question. (Tr., p. 52).[5]

Gagnon was transported to an Albany police station. The officers attempted to elicit a written statement from the defendant, but he stated that he needed a translator. (Tr., p. 54). The officers had a trooper who spoke French ask Gagnon, in French, if he wished to make a written statement. He refused. (Tr., p. 55).

## III. DISCUSSION

### A. "Seizure"

■ An initial question that must be answered is whether Gagnon was "seized" so as to implicate the Fourth Amendment. "Not every encounter between a police officer and an individual is a seizure implicating the [F]ourth [A]mendment's protec-

tions." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990); *see also United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992). When the police have in some way restrained the liberty of an individual, however, a court may find that a seizure has occurred. *Terry v. Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Determining whether a seizure has occurred requires a court to analyze "whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The Supreme Court has advised courts, when making the determination, to look at such factors as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

Here, the facts that the officers who approached Gagnon in the restaurant did not have their weapons drawn and that Gagnon was not immediately secured in handcuffs do little damage to the evident fact that the defendant was seized. He was approached in the restaurant by three officers, two of which were in police uniform. They stood directly in front of the booth where he was sitting, and even after Gagnon stood up, there is no indication that the officers were moving out of his way or were going to allow him to leave. The credible testimony established further that questions were not so much asked of

---

**5.** Sgt. Miserendino claims that an inventory of the tractor trailer was taken by another officer who impounded the vehicle. This inventory was on an "impound form," which documented the items inside the vehicle. (Tr., p. 52). Without more, it seems that this form is completely irrelevant. According to

Miserendino, it is an inventory of the items in the tractor trailer, not an inventory of the items seized. If this form was filled out at the impound, it seems logical to conclude that the form could not have included items already taken out of the cab.

Gagnon as they were put to him. According to Sgt. Miserendino, Gagnon was repeatedly questioned on whether he knew Simoneau. The defendant did not feel as though he were free to terminate the encounter and leave. In addition, the fact that his commercial driver's license was not given back to him further bolsters the conclusion that he reasonably felt he was not free to terminate the encounter and leave the restaurant. *See, e.g., United States v. Jordan,* 958 F.2d 1085, 1087 (D.C.Cir.1992) (collecting cases). Thus, Gagnon was effectively seized in the restaurant when Miserendino obtained and retained his commercial driver's license, and the Fourth Amendment is implicated.

### B. *Consent to search*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Bd. of Educ. of Independent School District No. 92 of Pottawatomie Cty. v. Earls,* — U.S. ——, 122 S.Ct. 2559, 2564, 153 L.Ed.2d 735 (2002) (quoting U.S. Const. Amend. IV). In a motion to suppress evidence seized after a search, the defendant bears the burden of showing his or her Fourth Amendment rights were violated. *Rakas v. Illinois,* 439 U.S. 128, 131, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The defendant must first prove that he had an expectation of privacy in the place searched and items seized. *See United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991).[6] The defendant must then prove that the search was conducted

without a warrant. *United States v. Sacco,* 563 F.2d 552, 558 (2d Cir.1977). As a general rule, a law enforcement official must obtain a search warrant in order to seize an individual's property. *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam); *United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir.1989). Warrantless searches are per se unreasonable, *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and thus presumptively unconstitutional under the Fourth Amendment. *Dyson,* 527 U.S. at 466–67, 119 S.Ct. 2013.

If the defendant succeeds in showing that the officers conducted a warrantless search, the burden shifts back to government to show that the search fell within one of the exceptions to the warrant requirement. The exceptions to the warrant requirement are "few in number and carefully delineated." *United States v. United States District Court,* 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *United States v. Kiyuyung,* 171 F.3d 78, 83 (2d Cir.1999) (exceptions are "specifically established and well-delineated"). One exception to the warrant requirement arises when "the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Elliott,* 50 F.3d 180, 185 (2d Cir.1995). If the government relies on the consent exception, it must demonstrate by a preponderance of evidence that consent was "voluntary." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Buettner-*

---

**6.** "For an individual's expectation of privacy to be legitimate, he must have exhibited an actual (subjective) expectation of privacy and the expectation must be one that society is prepared to recognize as reasonable." *United States v. Reyes,* 283 F.3d 446, 457 (2d Cir. 2002); *see also Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (movant "must demonstrate that he personal-

ly [had] an expectation of privacy in the place searched, and that his expectation [was] reasonable."). Such expectation must be demonstrated by testimony or affidavit. *See Rawlings v. Kentucky,* 448 U.S. 98, 104–06, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). There is no dispute that Gagnon had an expectation of privacy in his tractor trailer and the contents therein.

*Janusch,* 646 F.2d 759, 764 (2d Cir.1981). The main inquiry is whether the purported consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993); *United States v. Vasquez,* 638 F.2d 507, 524 (2d Cir.1980).

The focus of Fourth Amendment as a whole, and of the consent issue, is one of objective reasonableness. *Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001); *United States v. $557,933.89, More or Less, in United States Funds,* 287 F.3d 66, 82 n. 12 (2d Cir.2002) (citations omitted). Consent can be express or implied, can be "found from an individual's words, acts, or conduct[,]" *United States v. Garcia,* 56 F.3d 418, 423–24 (2d Cir.1995), and "need not be expressed in a particular form." *United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993). In conducting the "objective" analysis of whether police officers reasonably felt a suspect had consented, courts are instructed to pay attention to "the possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041; *United States v. Medico,* 557 F.2d 309, 312 (2d Cir.1977). Some factors to be considered in this regard are the age, education, intelligence, and physical and mental condition of the suspect, *United States v. Sanchez,* 635 F.2d 47, 58 (2d Cir.1980), and whether the suspect is a "newcomer to the law." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The Second Circuit has also indicated that a suspect's grasp of the English language, together with other subjective factors, may be relevant in determining consent. *Wilson,* 11 F.3d at 351 (indicating that "limited education and knowledge of the English language, coupled with the fact that he was not informed of his right to refuse consent to search, cause us to doubt whether Oscar actually consented to the search, ...").

The Supreme Court recently reiterated the principle that, as a per se rule, police officers are not always required to inform citizens of their right to refuse a warrantless search. *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 2113, 153 L.Ed.2d 242 (2002). Thus, the Second Circuit's holding, following *Schneckloth,* that a consent to search, in contrast to a waiver of a right, does not need to be intelligent and knowing, *Garcia,* 56 F.3d at 422, remains good law. As the court in *Garcia* noted, "[l]ack of awareness is only germane if it resulted in a consent to entry that was the product of duress or coercion," and, unlike waivers, the court rejected the idea that every presumption should be indulged against finding consent to searches. 56 F.3d at 424. "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Id.* at 422 (citing *Schneckloth,* 412 U.S. at 228, 93 S.Ct. 2041).[7] Instead, a suspect's knowledge of his right to consent

---

7. The notion that a consent to search need not be knowing or intelligent, or that presumptions should not be indulged against finding waivers, has been roundly criticized. For example, LaFave stated:

The *Schneckloth* majority never satisfactorily explained precisely why the intentional-relinquishment-of-a-known-right waiver requirement is applicable only to those rights that protect a fair criminal trial. Much is made of the fact that the Court had not theretofore imposed the waiver requirement as to any other kind of constitutional right, but this overlooks the fact that *Schneckloth* was the first case in which the Court faced the issue. The Court quite correctly said that the protections of the Fourth Amendment have to do with privacy rather than accuracy in the guilt-determination process, but it is never explained why unwitting surrender of the right to privacy should not be a matter of concern. It is denied that a search is somehow unfair if a person consents to a search, but this is a nonsensical observation when used to re-

is "is [just] one factor to be taken into account..." *Drayton*, 122 S.Ct. at 2113; *see also Garcia*, 56 F.3d at 422–23 ("knowledge of the right to refuse consent is not a requirement to finding of voluntariness, although it may be a factor in ascertaining whether the consent was coerced"); *United States v. Troche*, 181 F.Supp.2d 340, 347 (S.D.N.Y.2002) (recognizing that person's not understanding what he is consenting to, though not dispositive, raises concerns as to voluntariness of consent).

Though consent will be vitiated where police officers tell a subject that they have a search warrant when they in fact do not, *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the Second Circuit has held that statements by officers informing a suspect that a search warrant will be obtained if he does not consent are not sufficiently coercive so as to make consent involuntary, *see United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983), and that consent is

even not involuntary where police tell a suspect that they will remain in his home until they receive a search warrant. *See United States v. Yu–Leung*, 51 F.3d 1116, 1119 (2d Cir.1995). Consent has further been found to be "voluntary" where the defendant gave it only after five hours in custody, *see United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988), and even where a defendant gave consent only after he was questioned for several hours, force was used during his arrest, and the officers threatened to disrupt his home if he did not cooperate with them. *See United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir.1987).

As the cases make quite clear, the multitude of factors that may be present in any given situation, including the suspect's "subjective" traits, compel courts to look at "the totality of circumstances" when engaging in the "objective" analysis. *Drayton*, 122 S.Ct. at 2113; *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041.[8] Despite the

---

solve the very meaning of the word consent. Of course there is nothing unfair about the police searching in response to a voluntary and knowing relinquishment of Fourth Amendment protections. But if, as assumed by the *Schneckloth* majority, consent may be present even when the consenting party is ignorant of his Fourth Amendment rights, then it is difficult to see how it can be concluded that a search pursuant to such a consent is not unfair but rather an event in which the community has a real interest. As was stated in *Escobedo v. Illinois*, [378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964),] "no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights."

Wayne R. LaFave, 3 Search & Seizure § 8.1 (3d ed.1996) (internal quotations and citations omitted).

8. The judicially created framework of the consent doctrine has been severely criticized, with no small measure of merit, as ignoring the practical realities of encounters between

police and citizens. It has been said that "[t]he doctrine of consent currently applied by the Court encourages officers to take advantage of ordinary citizens. These rules are not sufficiently sensitive to the disparate power relationship that exists between the officer in uniform and members of the public... The officer in uniform, even one who is a member of a less powerful group, represents power that is not easily ignored." Robert V. Ward, *Consensual Searches, the Fairytale that Became a Nightmare: Fargo Lessons Concerning Police-initiated Encounters*, 15 Touro L.Rev. 451, 454 and 456 (1999); *see also* Marcy Strauss, *Reconstructing Consent*, 92 J.Crim. L. & Criminology 211, 221 (2002) (The law of consent "fails to acknowledge the simple truism that many people, if not most, will always feel coerced by 'requests' to search. To most people, the request to search will be considered an uncontrovertible demand to search"); LaFave, *supra* note 10, at n. 1 (citing Daniel L. Rotenberg, *An Essay on Consent(less) Police Searches*, 69 Wash. U. L.Q. 175, 193 (1991)) ("Both law and psychology point to the same conclusion—consent in reality is consentless").

supposed "narrowness" of exceptions to the warrant requirement of the Fourth Amendment, courts have readily upheld warrantless searches and seizures,[9] and, more specifically, readily found consent to be voluntary.[10]

Several cases, many within the Second Circuit, have dealt specifically with whether a suspect with less than ideal English language skills can give an effective voluntary consent. The instant situation, however, does not present a "typical case of a knowledgeable suspect extending consent to officers under circumstances where they readily know could have obtained a search warrant and then attempting to have the evidence suppressed on the ground that the consent was not voluntary." *United States v. Miley*, 513 F.2d 1191, 1202 (2d Cir.1975). Nor is this a case where Gagnon was informed of his right to refuse consent, *United States v. Oguns*, 921 F.2d 442, 448 (2d Cir.1990), or where Gagnon

9. As Justice Stevens noted in his dissent in *California v. Acevedo*, "the Court has heard argument in 30 Fourth Amendment cases involving narcotics. In all but one, the government was the petitioner. All save two involved a search or seizure without a warrant or with a defective warrant. And, in all except three, the Court upheld the constitutionality of the search or seizure." 500 U.S. 565, 601, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (citations omitted).

10. Indeed, the case law bears out that the oft-used tactic of gleaning a consent out of a suspect is almost always upheld by courts. In seemingly direct contradiction to the instruction that the exception is to be narrowly construed, a very rough Westlaw search of reported federal cases from 2002 alone revealed that consent was found to be, or affirmed as, voluntary almost 75% of the time. *See Drayton*, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242; *United States v. Montano–Gudino*, 309 F.3d 501 (8th Cir.2002); *United States v. Ramstad*, 308 F.3d 1139 (10th Cir.2002); *United States v. Richardson*, 304 F.3d 1061 (11th Cir.2002); *United States v. Melendez*, 301 F.3d 27 (1st Cir.2002); *United States v. Elkins*, 300 F.3d 638 (6th Cir.2002); *United States v. Carter*, 300 F.3d 415 (4th Cir.2002); *United States v. Burns*, 298 F.3d 523 (6th Cir.2002); *United States v. Pena–Sarabia*, 297 F.3d 983 (10th Cir.2002); *United States v. Todhunter*, 297 F.3d 886 (9 th Cir.2002); *United States v. Solis*, 299 F.3d 420 (5 th Cir.2002); *United States v. Ramirez–Chilel*, 289 F.3d 744 (11 th Cir.2002); *United States v. Pennington*, 287 F.3d 739 (8 th Cir.2002); *United States v. Jones*, 286 F.3d 1146 (9th Cir.2002); *United States v. Genao*, 281 F.3d 305 (1st Cir.2002); *United States v. Moreno*, 280 F.3d 898 (8th Cir.2002); *United States v. Bunnell*, 280 F.3d 46 (1st Cir.2002); *United States v. Hernandez*, 279 F.3d 302 (5th Cir. 2002); *United States v. Childs*, 277 F.3d 947 (7th Cir.2002); *Potts v. City of Philadelphia*, 224 F.Supp.2d 919 (E.D.Pa.2002); *United States v. Ramirez*, 213 F.Supp.2d 722 (S.D.Tex.2002); *United States v. Maldonado*, 213 F.Supp.2d 710 (S.D.Tex.2002); *United States v. Laureano Velez*, 210 F.Supp.2d 54 (D.Puerto Rico 2002); *United States v. Ray*, 199 F.Supp.2d 1104 (D.Kan.2002); *United States v. Koubriti*, 199 F.Supp.2d 656 (E.D.Mich.2002); *United States v. Perez*, 198 F.Supp.2d 406 (S.D.N.Y.2002); *United States v. Wiggins*, 192 F.Supp.2d 493 (E.D.Va.2002); *United States v. Matau*, 191 F.Supp.2d 1173 (D.Hawai'i 2002); *Troche*, 181 F.Supp.2d 340.

Cases not finding or affirming voluntary consent numbered only ten. See *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002) (finding not that consent was involuntary, but that it was product of coercion); *United States v. Yousif*, 308 F.3d 820 (8th Cir.2002); *United States v. Haynes*, 301 F.3d 669 (6th Cir.2002); *United States v. Hernandez*, 224 F.Supp.2d 1156 (W.D.Tenn.2002); *United States v. Hernandez*, 214 F.Supp.2d 1344 (S.D.Fla.2002); *United States v. Barrington*, 210 F.Supp.2d 773 (E.D.Va.2002); *Fewless ex rel. Fewless v. Bd. of Educ. of Wayland Union Schools*, 208 F.Supp.2d 806 (W.D.Mich.2002); *United States v. Awadallah*, 202 F.Supp.2d 82 (S.D.N.Y.2002); *United States v. Long Huang You*, 198 F.Supp.2d 393 (S.D.N.Y.2002); *United States v. Gould*, 194 F.Supp.2d 482 (M.D.La.2002).

It may be a safe assumption that, since there is more support in the jurisprudential archives for finding or affirming consent as voluntary, the addition of unreported and federal appendix cases to the comparison may further widen the gap.

signed and understood a consent to search form. *United States v. Medico,* 557 F.2d 309, 312 (2d Cir.1977). Nor is this a case where Gagnon clearly understands and speaks English after spending a significant amount of time in the United States, *Oguns,* 921 F.2d at 448 and *United States v. Rojas,* 783 F.2d 105, 107–08 (7th Cir. 1986), or has demonstrated proficiency in the English language by properly translating police statements to a friend, *United States v. Garcia,* 897 F.2d 1413, 1419 (7th Cir.1990), or even has any sufficient grasp of English, *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983), or has at least sufficient English receiving, as opposed to speaking, skills, *United States v. Sanchez–Valderuten,* 11 F.3d 985, 990–91 (10th Cir.1993), or where any cogent conversation in English occurred. *United States v. Gutierrez–Mederos,* 965 F.2d 800, 803 (9th Cir.1992). Nor is this a case where the officers conversed with Gagnon in his native French language, *Sanchez,* 635 F.2d at 60, or where the officers spoke to Gagnon in both French and English, *United States v. Gaviria,* 740 F.2d 174, 182 (2d Cir.1984), or where the officers asked questions in French but were answered in English, *United States v. Padilla–Pena,* 129 F.3d 457, 467 (8th Cir.1997), or where the officers at least conducted their questioning through a French interpreter. *United States v. Sanchez,* 32 F.3d 1330, 1335–36 (8th Cir.1994). None of these factors, which militate toward finding a consent voluntary, are present in this case.

Testimony has established that Gagnon's English is "broken." (Tr., pp. 83–84, 139). To comply with the binding legal mandates, however, it is necessary to determine if it is "broken" enough to render his consent involuntary. Gagnon is a French-speaking Canadian who dropped out of French-speaking school at the age of sixteen, and has had no formal English education. He does not travel often to the United States, and when he does, he uses the small fragments of the English language he has picked up at truck stops to facilitate fulfillment of his basic needs, like the procurement of sleeping quarters and food. One would assume the registration process at Fox Run is similar to those throughout the nation's highway system, at least for truck drivers. Gagnon credibly testified that he usually just hands the clerk his commercial driver's license and the clerk fills out the registration form for him. In any event, the defendant can recognize the English word "name," and the words "company," and "address" are near the same in French and English. He was able to order a meal at McDonald's, but only because the menu corresponds with the French-language McDonald's menu found in Quebec. In keeping with the principles of the Supreme Court and the Second Circuit, this is not to say that these factors alone compel a finding that his consent was involuntary. Rather, they serve as support for the contention that this man, taking all subjective factors into account, could not possibly have uttered speech or demonstrated conduct that a reasonable person could construe as voluntary consent.

The prosecution seems to make much of the fact that Gagnon could recognize dollars and cents. Even assuming he had knowledge of such "numbers," the establishment of such a fact is of no aid to the government. Gagnon did admit that he picked up fragments of English in truck stops. It is entirely plausible knowing how to compute dollars and cents is one such thing. He did not come to the United States often, but he came sometimes. In order to pay for his basic necessities, he had to be aware of the American currency scheme, or else a clever merchant with improper motives may be able to unfairly shortchange him. It is also plausible that such knowledge came as incident to his employment as a truck driver. He may

have been compelled to learn currency conversion so he could be reimbursed by his employer for expenses. In any event, his elementary knowledge of American currency is of no help to a reasonable person deciding whether he voluntarily consented to a search of his tractor trailer.

The fact that Gagnon said the word "yes" when Sgt. Miserendino asked him if he was "Eric Gagnon" has little weight. Initially, it is noted that knowing the word "yes" demonstrates no more grasp of English than would an American's grasp of Spanish be shown through knowledge that "si" means the same thing in Spanish. All witnesses testified that Miserendino used Gagnon's name in question form. Any person would make some response if they hear their name being called, no matter what language it is in, especially if Miserendino's claim that he was nothing short of polite in posing the query is accepted as true. The defendant's "yes" response to his name being used in a question therefore does not support an objective belief that he voluntarily consented to a search.

The same logic applies to Gagnon's response to the question containing the name "Daniel Simoneau." He has a brother named Daniel. He thought the police were mistaken when they said "Simoneau," telling them instead that his brother's last name is "Gagnon." Sgt. Miserendino himself admitted that, upon his continued questioning as to whether Gagnon knew Simoneau, the defendant kept repeating that he knew a Daniel Gagnon. Gagnon credibly testified that he responded, "Daniel Gagnon, my brother I know." (Tr., p. 187). This statement shows, and should have very much shown to Miserendino, that Gagnon did not understand the question specifically or the conversation in general. No support for the notion that the defendant voluntarily consented can be inferred from this statement.

Further, Gagnon did not, as Sgt. Miserendino seems to suggest, lead the officers out of the restaurant. He followed them, believing he had no choice in the matter.

Similarly, no consent could be reasonably inferred at the back of the trailer, when Gagnon was instructed to then open the cab of the tractor. Initially, pursuant to the credible testimony, it is worth noting that Sgt. Miserendino did not ask Gagnon to open the cab; he ordered Gagnon to open the cab. Thus, in terms of consenting by answering a question, there clearly was none.[11] The defendant's initial inaction also does not give rise to an objective belief he consented to the search. Miserendino knew or should have known Gagnon felt he had little choice in the matter anyway, so objecting would have done him no good. Also, the credible testimony established that the defendant voiced some objection just as the sergeant was preparing to proceed to the rear portion of the cab. While the defendant may not have been able to properly phrase such objection in textbook English, it should have been apparent to Miserendino that he objected to the search, especially since other officers had to restrain a frantic Gagnon from entering the cab behind Miserendino.

Other factors, or, rather, the absence of other factors, besides the actual conversations that took place between Gagnon and the officers demonstrate that Sgt. Miserendino knew or should have known that Gagnon did not voluntarily consent to a search of his tractor trailer. First, Gagnon was not informed he had a right to refuse consent. Gagnon was a foreigner in the United States. He is most certainly a "newcomer to the law," and has little to knowledge of our system of justice except perhaps to the extent it may be consistent with Canadian law. He certainly did not have any knowledge that he had the right to refuse consent, but the logical problems

11. *See supra* note 4.

produced by the Second Circuit's admonition that a "voluntary consent" need not be "knowing" and "intelligent" are best addressed in other fora. While informing him of such a right is not required, it is a factor to be considered, and the New York State police field manual recognizes this, mandating that officers inform suspects of the right.

Second, and closely related to the first, Sgt. Miserendino did not ask Gagnon to sign a consent to search form. Had he truly believed that Gagnon was capable of giving a voluntary consent, he would have had no reason to completely deviate from New York State Police practice by not asking Gagnon to sign a consent form. Sgt. Miserendino is an experienced law enforcement officer for the New York State police, and he admitted he was aware of the consent to search form, yet he at no time even considered using it. If, as he testified, he believed that he had consent from Gagnon to search the tractor trailer, then there is no reason for him not to at least offer the form. There were no exigent circumstances present. The currency in the tractor trailer was not in danger of destruction. The defendant and his tractor clearly were not going anywhere. This factor weighs against a reasonable person believing Gagnon voluntarily consented.[12]

Third, and perhaps most importantly, sufficient evidence is present that Gagnon's alleged consent was coerced. No less than three law enforcement personnel, all with weapons, albeit holstered, approached Gagnon in the restaurant. The two in uniform stood in front of the defendant's booth, effectively blocking his way out. His identification was taken. When Gagnon rose after hearing Sgt. Miserendino's initial query, the officers did not move out of his way. He did not feel free to leave, and he felt that he had to answer the officers' questions. The last statement from Miserendino, and the one central to this inquiry, was an instruction that Gagnon open his tractor trailer. It was stated in an authoritative tone of voice. It was a request much more than a question allowing alternative responses. Gagnon had no choice, and there is no basis for Miserendino, or any of the other officers, to believe that Gagnon had, or thought he had, a choice in the matter. He did express some nonchalance when his trailer was opened, but that was because he knew it to be empty. It is common, especially these days, for commercial truck drivers to have their loads subject to more scrutiny. More on point, as noted before, his "subjective" factors displayed themselves in such a way that an "objective" reasonable person would know that he felt he had to agree to the search. In addition, one is hard-pressed to think of a better motive for coercing a consent out of a suspect than a statement from a prosecutor that nothing can be done in the absence of such consent. Therefore, the totality of the circumstances indicate that a reasonable person would not have believed Gagnon voluntarily consented to the search of his tractor trailer, and his motion to suppress the evidence seized from the tractor trailer must be granted.[13] Be-

---

**12.** When dealing with this non-English speaking—non-citizen—suspect, if the officers had merely followed the procedures set forth in the State Police Field Manual, there may not have been a serious issue concerning the validity of the search.

**13.** The sole purpose of the suppression hearing in this case was to ascertain whether Gagnon's consent was voluntary. Nonethe-

less, it should be noted that the seizure in this case is not saved by any other exception to the warrant requirement. For the admissibility of the evidence to be saved because it was in "plain view," it would need to be demonstrated that: 1) the incriminating nature of the object seized is "immediately apparent," *Bradway v. Gonzales,* 26 F.3d 313, 320 (2d Cir.1994); and 2) "the officers viewed the

cause Gagnon's consent was not voluntary, the issue of whether the officers exceeded the scope of any consent need not be determined.

While it is admitted that the instant case has no connection to issues we now associate with national security, the premise upon which the holding is based retains relevance in that arena and perhaps other related ones in the future and, as such, a few comments are appropriate. Attention is paid to the sensitivities of the moment, namely, the need to grant law enforcement officials some degree of latitude when questioning and searching those from other countries who may wish to do the United States harm. Accommodating that need will often require some infringement of constitutional rights traditionally held sacrosanct. Nonetheless, it is incumbent, to our survival as a free and democratic nation, that we not allow that need to entirely choke the life out of our already relaxed civil liberties by authorizing police officers to manipulate a person uneducated in the American law and English language. While no potent opposition can or should be mounted against the idea of law enforcement being more vigilant and aware of suspicious activities within our borders, the rights of a person of foreign descent do not automatically evaporate under the weight of such an idea. Such a person retains rights as well, and the infusion of persons of different cultures, with full and equal rights, is the backbone of the proud claim that ours is the greatest country on Earth.

## IV. CONCLUSION

For the foregoing reasons, defendant Eric Gagnon's consent to search his tractor trailer was not voluntary, and any evidence seized from such search must be suppressed.

Accordingly, it is

ORDERED that

---

object from a lawful vantage point—i.e., that the officers 'have not violated the Fourth Amendment in arriving at the place where they can see the object.'" *United States v. $557,933.89, More or Less, in United States Funds,* 287 F.3d 66, 81 (2d Cir.2002) (quoting *United States v. George,* 975 F.2d 72, 78 (2d Cir.1992)). With regards to the second element, there is no question that the officers were within their powers to be at Fox Run in general. There is also no question, however, that the objects seized could not been seen from a general vantage point in the rest area. The only reason Miserendino was able to see the object taken was because he was in the cab. Thus, because Miserendino did not have permission, or legal justification, for being in the cab, the second element is not fulfilled. Even if it were, the incriminating nature of the object was not "immediately apparent" to Miserendino. He testified that the duffel bag "felt like there was some sort of paper product or books or something of a hard nature inside the bag and definitely not clothing." (Tr., p. 35). The incriminating nature of paper products, books, or things of "hard nature" is not "immediately apparent". Likewise, the objects seized from the cab cannot be saved under the "automobile exception," which allows officers to conduct a warrantless search of containers within a car if they have probable cause to believe such containers contain contraband. *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). It has already been determined that the officers did not have probable cause to arrest Gagnon prior to the search. (See Docket No. 22, Memorandum–Decision and Order granting in part and denying part defendant's omnibus motion). In addition, the United States Attorney's Office itself told Harris that the officers did not have probable cause to search the cab without a warrant, or probable cause to get a warrant in the first place. (Tr., pp. 117–18, 136). This exception, thus, does not apply.

Defendant, Eric Gagnon's, motion to suppress evidence seized from his tractor trailer is GRANTED.

IT IS SO ORDERED.